SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

### In the Matter of the Estate of Adrian J. Folcher (A-3-14) (074590)

**Argued November 9, 2015 -- Decided April 26, 2016**

**LaVECCHIA, J., writing for a majority of the Court.**

The issue in this appeal is whether the Court should expand the narrow exception to the American Rule created in In re Niles Trust, 176 N.J. 282 (2003), allowing attorneys' fees to be assessed against an executor or a trustee who "commits the pernicious tort of undue influence," to a person who does not owe a fiduciary responsibility to an estate or its beneficiaries.

Adrian Folcher married petitioner Bernice Tambascia-Folcher in 2002. Each had children from a prior marriage. A post-marital agreement between Folcher and Bernice provided that their incomes would remain separate, that they would share expenses associated with Bernice's Cherry Hill home, where they lived since approximately 1992, and that any real estate they owned jointly would be held in trust for the benefit of the surviving spouse until his or her death. Folcher executed a will in November 2003 (November 2003 Will) naming Mary Lee, his daughter, as executor. In addition, Folcher and Bernice wrote a letter to Folcher's attorney expressing their wishes about distribution of personal property; specifically, Folcher's boat, pickup truck, and car were to be bequeathed to his children. In January 2006, Folcher had his attorney revise his will (January 2006 Will). Mary Lee remained the executor, but the revised will directed that property not distributed by an attached memorandum, which specifically bequeathed certain items of personal property including the earlier mentioned boat and motor vehicles, would pass to Bernice. In March 2007, Folcher had his attorney draft a deed for Bernice's Cherry Hill home in which Bernice transferred the home to him and Bernice as "tenants in common" (March 2007 Deed). Thus, upon his death, Folcher's one-half interest in the home would pass to his estate, not to Bernice.

In mid-September 2007, suffering from metastasized kidney cancer, Folcher was temporarily hospitalized. He was discharged to return home on September 22, 2007, knowing that further treatment, other than hospice care, was of no use. He was prescribed a combination of potent pain medications, was wheelchair-confined, needed oxygen support, and generally relied on Bernice for his basic daily care. On September 28, Folcher purportedly executed two codicils to his January 2006 Will. Codicil #1 stated, "I affirm my last will and testament dated January 19, 2006, to be my wishes. I want my wife Bernice [Tambascia-]Folcher to have all personal property and all items in our home." Codicil #2 was a copy of Codicil #1 with the above whited-out and replaced by the following handwritten statement: "I want my spouse Bernice Tambascia[-Folcher], to have all personal accts./property [and] all items in our home." Bernice testified that she prepared Codicil #2 after Folcher rejected the first as not properly expressing his wishes.

On September 29, Bernice and her daughter, Desiree, drove Folcher to a local branch of Wachovia Bank. According to Bernice, Mileva Boncic, a bank employee, who also was a notary, exited the bank building, went to Folcher, and notarized documents that Folcher signed in the car. Desiree testified that the witnesses to the signing watched through the bank's window and that the witnesses' signatures were affixed when the document, purportedly a new deed to the Cherry Hill home (September 2007 Deed) was taken inside the bank. The new Deed made Folcher and Bernice owners as "joint tenants with the right of survivorship," instead of "tenants in common" as the March 2007 Deed provided. Codicils #1 and #2 each contained a purported notarization by Ms. Boncic, who also notarized the September 2007 Deed, and a purported witness attestation by Anthony Mannello, another bank employee. At trial, Boncic and Mannello testified that they had not witnessed the signing of the codicils.

Folcher passed away on October 2, 2007. Approximately forty-five minutes after his death, Bernice went to the Camden County Clerk's Office to record the September 2007 Deed. Additionally, on the day of his passing, and very shortly thereafter, Bernice withdrew a total of $25,886.41 from Folcher's bank accounts. Further, between September 26 and 28, 2007, inter vivos transfers of the titles to his vehicles and boat were accomplished. On October 15, 2007, Mary Lee submitted the November 2003 Will to the Camden County Surrogate for probate. That same day, Bernice gave the Estate's attorney, Edward Sheehan (Sheehan), several documents, including a copy of the November 2003 Will and Codicil #1, but failed to include Codicil #2 or the letter memorandum bequeathing certain items of personal property. Over a year after Folcher's death, on October 23, 2008, Bernice submitted Codicil #2 to the Camden County Surrogate for probate and then mailed a copy to Sheehan, who testified that he believed Codicil #2 to be fraudulent.

Litigation commenced after Mary Lee filed a final accounting of the Estate. On November 5, 2012, the Chancery Court determined that the codicils and the September 2007 Deed executed by Folcher were the product of undue influence by Bernice and that she had engaged in fraud and forgery. The court voided the September 2007 Deed and both codicils, and Bernice was ordered to reimburse the Estate for the money taken from the accounts and for the value of the two vehicles and the boat that she had previously sold. On December 10, 2012, the trial court awarded $397,309.19 in attorneys' fees to the Estate, citing Niles, supra, 176 N.J. 282, and In re Estate of Stockdale, 196 N.J. 275 (2008). The trial court acknowledged that Bernice was neither an executor nor a trustee of the Estate. Yet the court determined that an award of counsel fees could be founded on Bernice's confidential relationship with Folcher and proof of undue influence.

Bernice appealed, and the Appellate Division affirmed the fee award. Although Bernice was not a fiduciary, the panel reasoned that she was in a confidential relationship with Folcher and exercised undue influence to modify estate documents, obtain property through lifetime transfers, and generally expand her own beneficial interests. The panel saw "no just reason why she, like a corrupt fiduciary, should not make the estate whole."

The Supreme Court granted certification primarily to address the novel use of fee-shifting in this probate matter. 219 N.J. 630 (2014).

**HELD:** The Court declines to expand the exception to the American Rule created in In re Niles Trust, 176 N.J. 282 (2003), to a person who does not owe a fiduciary responsibility to an estate and its beneficiaries. In this case, because the confidential relationship endowed Bernice with an obligation to only her husband, and not the Estate, a fee award was not the proper vehicle to do equity.

1. New Jersey is an "American Rule" jurisdiction, meaning it has a "strong public policy against shifting counsel fees from one party to another." Stockdale, supra, 196 N.J. at 307. The American Rule prohibits recovery of attorneys' fees "by the prevailing party against the losing party." Ibid. (quoting Niles, supra, 176 N.J. at 294). There are few authorized exceptions. R. 4:42-9. In relatively recent years, a few Court-sanctioned "exceptions to the American Rule that are not otherwise reflected in the text of Rule 4:42-9" and that are not provided for via statute, court rule, or contract have developed. In re Estate of Vayda, 184 N.J. 115, 121 (2005). Saffer v. Willoughby, 143 N.J. 256, 272 (1996), recognized an exception to the American Rule in the context of successful claims for attorney malpractice. Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 443 (2001), expanded that exception in the attorney-client-relationship setting to include claims against attorneys who intentionally violate their fiduciary duties. Most recently, this Court expanded that exception outside of the attorney-client setting to attorneys acting in a fiduciary capacity as escrow agents. See Innes v. Marzano-Lesnevich, ___ N.J. ___ (2015). In Niles, the Court created an exception to the American Rule in trustee or executor undue influence cases "based on the fiduciary's intentional misconduct regardless of his or her professional status." 176 N.J. at 300. In Vayda, the Court declined to extend the exception created in Niles to a non-attorney executor of an estate found to have acted negligently and with bad faith in his administration of the estate, but who was not found to have committed undue influence. 184 N.J. at 124. In Stockdale, the Court reaffirmed, albeit in dicta, the narrowness of the Niles fee-shifting exception to the American Rule. 196 N.J. at 307. (pp. 13-20)

2. Those who hold the legal title of executor or trustee plainly owe a fiduciary duty to the beneficiaries of the estate or the trust respectively. But there is no dispute on this record that Bernice was not Folcher's executor and that she did not owe a formal fiduciary duty to the Estate or to its beneficiaries. Bernice was in a confidential relationship with only her husband. The burden of establishing undue influence rests with the party contesting the will. However, "[w]hen there is a confidential relationship coupled with suspicious circumstances, undue influence is presumed and the burden of proof shifts to the will proponent to overcome the presumption." Stockdale, supra, 196 N.J. at 303. Bernice's confidential relationship with Folcher did not encumber her with any special duty toward the Estate's beneficiaries. In addition, Bernice was a beneficiary herself. Untethered from a duty to the beneficiaries, a fee award in this undue influence setting would be based exclusively on the egregiousness of the undue influence conduct. That is an unwarranted expansion of Niles, which created only a narrow exception to the American Rule. The trial court mistakenly thought that fee-shifting was available under Niles and used fee-shifting, in lieu of other claims and remedies, to achieve equitable relief for the Estate in this matter. The Court remands the matter to the trial court to vacate the attorney fee award and to reconsider the interwoven relief that the court has available to it to fashion a truly equitable remedy for the circumstances here. (pp. 20-26)

The judgment of the Appellate Division is **AFFIRMED IN PART** and **REVERSED IN PART**, and the matter is **REMANDED** to the trial court for further proceedings consistent with the Court's opinion.

**JUSTICE ALBIN, DISSENTING**, would uphold the probate court's equitable order requiring Bernice to reimburse the reasonable attorney's fees expended by the Folcher estate in protecting the Folcher children's inheritance from her fraud.

**CHIEF JUSTICE RABNER, JUSTICES PATTERSON and SOLOMON, and JUDGE CUFF (temporarily assigned) join in JUSTICE LaVECCHIA's opinion. JUSTICE ALBIN filed a separate, dissenting opinion. JUSTICE FERNANDEZ-VINA did not participate.**

IN THE MATTER OF THE ESTATE
OF ADRIAN J. FOLCHER (a/k/a
ADRIAN J. FOLCHER, JR.),
DECEASED.


Argued November 9, 2015 – Decided April 26, 2016

On certification to the Superior Court,
Appellate Division.

J. Philip Kirchner argued the cause for
appellant Bernice Tambascia-Folcher
(Flaster/Greenberg, attorneys).

George J. Singley argued the cause for
respondent Estate of Adrian Folcher (Singley
& Gindele, attorneys).


JUSTICE LaVECCHIA delivered the opinion of the Court.

In In re Niles Trust, 176 N.J. 282, 298-99 (2003), this

Court created a narrow exception to the American Rule and

allowed attorneys' fees to be assessed against an executor or a

trustee who "commits the pernicious tort of undue influence."

This appeal centers on challenges to several documents and

disbursements that were purportedly executed by Adrian Folcher

in the closing days of his life.  Petitioner Bernice Tambascia-

Folcher, Folcher's wife and a beneficiary in a "confidential

relationship" with her aged and vulnerable husband, used that

relationship to commit a pattern of fraud, forgery, and undue

1

influence near the end of his life.  After the conclusion of a lengthy estate contest, the trial court invoked that relationship, coupled with its finding of undue influence, to shift the Estate's counsel fees to Bernice.

We, however, decline to expand the Niles exception to a person who does not owe a fiduciary responsibility to the Estate and its beneficiaries, no matter how repugnant the conduct. Because that confidential relationship endowed Bernice with an obligation to only her husband, and not the Estate, a fee award was not the proper vehicle to do equity.  The trial court had other, unused means at its disposal for that.  We remand to the trial court to vacate the fee award and to allow the court to consider other equitable relief that was foregone because fee-shifting mistakenly became an integral part of the court's equitable remedy.

I.

This case focuses on a series of acts taken by petitioner that expanded her beneficial interest in her husband Adrian Folcher's estate.  Our summary of those events reflects the facts as found by the trial court, except where direct reference otherwise is made to the record.[1]

---

[1] In setting forth the relevant background information from this highly contested, drawn-out estate dispute between Folcher's children and petitioner, we refer to family members and

2

Folcher and his first wife had three children:  Mary Lee, Thomas, and Patricia.  Following the death of his first wife in mid-2002, Folcher married Bernice that same year.  Folcher and Bernice had been living together in her Cherry Hill home since approximately 1992, although Folcher remained married in name to his first wife.  Bernice had two children from a prior marriage.

A post-marital agreement between Folcher and Bernice provided that their incomes would remain separate, that they would share expenses associated with Bernice's Cherry Hill home, and that any real estate they owned jointly would be held in trust for the benefit of the surviving spouse until his or her death.

With the assistance of his attorney, Folcher executed a will in November 2003, (November 2003 Will), naming Mary Lee executor.  In conjunction with that will's execution, Folcher and Bernice wrote a letter to the attorney expressing their wishes about distribution of personal property; specifically, Folcher's boat, pickup truck, and car were to be bequeathed to his children.

In January 2006, Folcher had his attorney revise his will (January 2006 Will).  Mary Lee remained the executor, but Folcher's revised will directed that any property not

petitioner by their first names to simplify our recitation.  We intend no disrespect.

3

distributed by an attached memorandum, which specifically bequeathed certain items of personal property including the earlier mentioned boat and motor vehicles, would pass to Bernice.

In March 2007, Folcher had his attorney draft a deed for Bernice's Cherry Hill home in which Bernice transferred the home to him and Bernice as "tenants in common," and not as "joint tenants with the right of survivorship" (March 2007 Deed).[2] Thus, upon his death, Folcher's one-half interest in the home would pass to his estate, not to Bernice. Folcher believed that he had materially contributed to the Cherry Hill home while he resided there and wanted his interest in the home protected for his children's benefit. The deed was executed and recorded in Camden County on September 7, 2007. Shortly thereafter, Folcher's health rapidly deteriorated.

In mid-September 2007, suffering from metastasized kidney cancer, Folcher was temporarily hospitalized. He was discharged to return home on September 22, 2007, knowing that further treatment, other than hospice care, was of no use. He was

---

[2] Previously, in August 2003, Folcher had his attorney draft a deed to the Cherry Hill home that would have made Bernice and him "tenants in common," but that deed was never signed or recorded. The trial court determined that proceeds in the amount of $125,000 (from Folcher's sale of his former home with his first wife), which were given to Bernice shortly after the 2003 deed was drafted, were in consideration of his obtaining a one-half ownership interest in the Cherry Hill home.

4

prescribed a combination of potent pain medications whose administration Bernice controlled and dispensed with enough randomness that the trial court found it difficult to discern whether Folcher was under- or over-medicated at times during the end of his life. He was wheelchair-confined, needed oxygen support, suffered from bed sores, and generally relied on Bernice for his basic daily care. During the final week of his life, his sister Rita Coghlan noted that he seemed tired and had trouble breathing and speaking. His condition was confirmed by the testimony of Dr. Mark Testa, whom the trial judge found credible.

Based on the testimony of Mary Lee, the trial court found that on Friday, September 28, Folcher told Mary Lee, by phone, that Bernice would not allow her to visit, and he further stated, "I can't fight [Bernice] anymore. It's too late for that." Bernice admitted that she told Folcher's family not to visit him on September 29, because she said she wanted private time with him. Yet she later told Mary Lee's husband that he could bring the grandchildren for a visit during the afternoon of Saturday, September 29 to watch a baseball game.

During those two pivotal days -- September 28 and 29, 2007 -- a number of actions were taken in relation to Folcher's estate. On September 28, Folcher purportedly executed two codicils to his January 2006 Will. Codicil #1 stated, "I affirm

5

my last will and testament dated January 19, 2006, to be my wishes. I want my wife Bernice [Tambascia-]Folcher to have all personal property and all items in our home." Codicil #2 was a copy of Codicil #1 with the above whited-out and replaced by the following handwritten statement: "I want my spouse Bernice Tambascia[-Folcher], to have all personal accts./property [and] all items in our home." According to Bernice's testimony explaining the two codicils, Folcher directed the preparation of Codicil #1 on September 28, and then she prepared Codicil #2 on the same day after Folcher rejected the first as not properly expressing his wishes.

On the morning of September 29, Bernice and her daughter, Desiree, moved Folcher into a car and drove him to a local branch of Wachovia Bank in Maple Shade. According to Bernice, the following transpired: Bernice requested that a bank employee, who also was a notary, exit the bank building, go to Folcher seated in the car in the bank parking lot, and notarize documents that Folcher would sign in the car. Bernice testified that the employee, Mileva Boncic, came outside and notarized a document. Desiree testified that the witnesses to the signing remained inside the bank and observed Folcher sign the document while watching through the bank's window and that the witnesses' signatures were affixed when the document was taken inside the bank. The document that purportedly was notarized in this

6

fashion was a new deed to the Cherry Hill home (September 2007 Deed).

The trial court found that the September 2007 Deed was drafted by Bernice using the March 2007 Deed as a template. The September 2007 Deed made Folcher and Bernice owners as "joint tenants with the right of survivorship," instead of "tenants in common" as the March 2007 Deed provided. The seller's residency certification was a photocopy of the one that accompanied the March 2007 Deed; however, the date was changed to September 29, 2007, and Folcher's name was added as a "seller."

As for Codicils #1 and #2 dated September 28, 2007, each contained a purported notarization by Ms. Boncic, the same bank employee who notarized the September 2007 Deed. Each codicil also contained a purported witness attestation by Anthony Mannello, another bank employee. At trial, Boncic and Mannello testified that they had not witnessed the signing of the codicils. Boncic's notary log referenced only the September 2007 Deed, with no reference to the September 28 codicils. She testified that she did not notarize any documents for Folcher on September 28, 2007 and that she would have remembered going outside the bank building on two successive days to notarize documents.[3]

_____

[3] Bernice disputed Boncic's testimony, pointing to Mannello's testimony that his and Boncic's signatures appeared to be on

7

Folcher passed away on October 2, 2007.  Approximately forty-five minutes after his death, Bernice went to the Camden County Clerk's Office to record the September 2007 Deed. Additionally, on the day of his passing, and very shortly thereafter, Bernice withdrew a total of $25,886.41 from Folcher's Sterling Bank account and Morgan Stanley account funds.  Further, between September 26 and 28, 2007, inter vivos transfers of the titles to his vehicles and boat were accomplished.

Following Folcher's death, on October 15, 2007, Mary Lee submitted the November 2003 Will to the Camden County Surrogate for probate.  That same day, Bernice gave the Estate's attorney, Edward Sheehan (Sheehan), several documents, including a copy of the November 2003 Will[4] and Codicil #1, but failed to include Codicil #2 or the letter memorandum bequeathing certain items of personal property.  Sheehan testified that he became suspicious of Codicil #1 because it plainly was not prepared by an

_____

both codicils and that Boncic's raised notary seal was on both codicils as well.  At trial, alternative possibilities as to how those documents, in their purported notarized and witnessed form, could have been manufactured were presented to the court.

[4] The trial court's factual findings state that Bernice initially also gave Sheehan the January 2006 Will.  However, the Appellate Division decision states that Bernice gave Sheehan the November 2003 Will, and that the January 2006 Will was discovered later and admitted to probate on judgment.  This detail was not integral to any of the trial court's findings and it is not important in the resolution of the issues before us.

8

attorney, contained errors, repeated certain bequests already in the November 2003 Will, contained interlineations, and failed to contain "appropriate acknowledgment paragraphs" alongside Boncic's signature purportedly notarizing the document. Accordingly, Sheehan advised Mary Lee not to submit Codicil #1 for probate. Through a subsequent application to the Superior Court, a judgment was entered on February 8, 2008, admitting the January 2006 Will for probate.

Over a year after Folcher's death, on October 23, 2008, Bernice submitted Codicil #2 to the Camden County Surrogate for probate and then mailed a copy to Sheehan. Codicil #2 had Boncic's signature and notary seal, but like Codicil #1 it also lacked an "acknowledgment paragraph." Sheehan testified that he believed Codicil #2 to be fraudulent because it was submitted over a year after Bernice had produced the other documents. According to Sheehan, besides appearing to be a cut-and-paste of Codicil #1, Codicil #2 also specifically mentioned "bank acc[oun]ts" which he believed to have been added after he informed Bernice that Codicil #1 would not govern bank accounts. When examined on why she initially gave Sheehan Codicil #1 yet waited a year to submit Codicil #2, Bernice testified that she thought they were the same, an explanation the trial court found not credible.

Litigation commenced after executor Mary Lee filed a final accounting of the Estate, lasted over five years, and culminated in a long bench trial in the Chancery Division. In its oral decision announced November 5, 2012, the court determined that the codicils and the September 2007 Deed executed by Folcher were the product of undue influence by Bernice. Although not required, the court emphasized that the proofs for those findings exceeded the clear-and-convincing evidential standard, not simply the preponderance-of-the-evidence standard required for undue influence. First, the judge found that Folcher and Bernice were in a "confidential relationship" due to Folcher's "vulnerable and fragile condition . . . at the time he allegedly undertook the transactions at issue." The court further found that "suspicious circumstances" surrounded the execution of the September 2007 Deed and Codicils #1 and #2, as well as the inter vivos transfers of title to the motor vehicles and boat. With the burden shifted to Bernice to demonstrate that those actions were not the product of undue influence, the court concluded that Bernice's proofs did not overcome that presumption. Indeed, the court noted that evidence adduced from Folcher's sister, once the burden had shifted, further cemented the evidence of undue influence.

In addition, on the Estate's request, the court found that the making and execution of the September 2007 Deed and Codicils

10

#1 and #2, the inter vivos transfers of titles to the motor vehicles and boat, and the withdrawal of $25,886.41 in total from Folcher's financial accounts, amounted to fraud and forgery by Bernice. The court voided the September 2007 Deed and both codicils, and Bernice was ordered to reimburse the Estate for the money taken from the accounts and for the value of the two vehicles and the boat that she had previously sold.

On December 10, 2012, the trial court awarded $397,309.19 in attorneys' fees (plus costs and expert witness fees) to the Estate, citing Niles, supra, 176 N.J. 282, and In re Estate of Stockdale, 196 N.J. 275 (2008). The trial court acknowledged that Bernice was neither an executor nor a trustee of the Estate. Yet the court determined that an award of counsel fees could be founded on Bernice's confidential relationship with Folcher and proof of undue influence. Although the Estate requested punitive damages, and although those damages were not unsupportable, the trial court declined to award punitive damages because the court, through its fee award, was already factoring in the substantial cost to the spousal beneficiary.

Bernice appealed, and the Appellate Division affirmed the fee award. Although Bernice was not a fiduciary, the panel reasoned that she was in a confidential relationship with Folcher and exercised undue influence to modify estate documents, obtain property through lifetime transfers, and

11

generally expand her own beneficial interests.  According to the panel, her fraud contributed to the erosion of the estate, and the panel saw "no just reason why she, like a corrupt fiduciary, should not make the estate whole."

## II.

Bernice argues that the Appellate Division erred in three respects:  (1) by expanding the narrow Niles exception to the American Rule against fee-shifting in estate cases beyond its explicit limits; (2) by declining to address all claims raised in her supplemental brief, which when distilled, essentially faulted the trial court's fraud fact-finding on the basis that the trial court did not expressly state the standard by which it reached its finding of fraud; and (3) by misstating several facts while addressing her factual arguments.  On the last point, Bernice maintains that the reliability of the Appellate Division's review, in its entirety, is undermined by the asserted lack of attention to details in the record.

The Estate's responsive arguments may be summarized as follows.  It first asserts that the Niles exception allowing fee-shifting in estate matters is not based solely on the legal position of the wrongdoer but the nature of the wrongful behavior.  From that, the Estate argues that fee-shifting was appropriate here based on Bernice's egregious conduct.  Second, the Estate contends that the Appellate Division plainly

12

considered and rejected the arguments raised in Bernice's supplemental brief through its discussion and affirmance of the trial court's legal reasoning, standards of proofs, and findings. The panel was not required to more specifically address arguments in order to reject them. Third, Bernice's harping on cherry-picked facts in an effort to mire the appeal in nondispositive factual details that allegedly were misstated does not provide a basis for overturning the Appellate Division's judgment. The details that Bernice emphasizes do not reasonably shake confidence in the overall picture of fraud, forgery, and undue influence painted by this record and found by the trial court.

We granted certification primarily to address the novel use of fee-shifting in this probate matter. 219 N.J. 630 (2014). We first turn to that issue.

### III.

New Jersey is an "American Rule" jurisdiction, meaning we have a "strong public policy against shifting counsel fees from one party to another." Stockdale, supra, 196 N.J. at 307. The American Rule prohibits recovery of attorneys' fees "by the prevailing party against the losing party." Ibid. (quoting Niles, supra, 176 N.J. at 294). Our Court Rules identify few authorized exceptions. Rule 4:42-9(a) provides that "[n]o fee for legal services shall be allowed in the taxed costs or

13

otherwise, except" in eight enumerated circumstances, none of which pertain to this matter.[5]  This Court has interpreted Rule 4:42-9 as generally "codif[ying] those specific instances where, in the absence of a separately enabling statute or contract, fee shifting is permitted."  In re Estate of Vayda, 184 N.J. 115, 120 (2005).

In relatively recent years, a few Court-sanctioned "exceptions to the American Rule that are not otherwise reflected in the text of Rule 4:42-9" and that are not provided for via statute, court rule, or contract have developed.  Id. at 121.  This category of common law fee-shifting defies any one ready descriptor but involves fiduciary breaches in certain settings.  The original two cases involved attorney misconduct arising out of the attorney-client relationship.  Saffer v. Willoughby, 143 N.J. 256, 272 (1996), recognized an exception to the American Rule in the context of successful claims for attorney malpractice.  Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 443 (2001), expanded that exception in the attorney-client-relationship setting to include claims against attorneys

---

[5] Specifically, Rule 4:42-9(a) details when an award of attorneys' fees is permitted in a family action, out of a fund in court, in a probate action in certain settings when fees may be paid out of the estate, in a mortgage foreclosure action, in a tax certificate foreclosure action, in an action on a liability or indemnity policy of insurance, as otherwise expressly provided by court rule in any action, and in all cases where attorneys' fees are permitted by statute.

who intentionally violate their fiduciary duties.  Most recently, this Court expanded that exception outside of the attorney-client setting to attorneys acting in a fiduciary capacity as escrow agents.  See Innes v. Marzano-Lesnevich, ___ N.J. ___ (2015).[6]

More to the point is our prior decision in Niles, on which the trial court based its fee award in this matter.  We turn directly to Niles for purposes of our present analysis.

In Niles, supra, the Court declared that "when an executor or trustee commits the pernicious tort of undue influence, an exception to the American Rule is created that permits the estate to be made whole by an assessment of all reasonable counsel fees against the fiduciary that were incurred by the estate."  176 N.J. at 298-99.  The Court explained that "[a] fiduciary relationship exists between a trustee and the trust[,] similar to the attorney-client relationship," and that "[b]oth the attorney and a trustee act as officers of the court when acting on behalf of clients and beneficiaries."  Id. at 297.  The Court concluded that non-attorney status should not prevent

---

[6] Although In re Estate of Lash, 169 N.J. 20, 32 (2001), is often included in discussions of this Court's case law permitting fee-shifting, it expressly disavowed connection to the American Rule.  Lash involved an administrator malfeasance claim covered by a surety bond and the fee issue that arose was whether the surety was responsible for fees incurred in suing on the bond.  Id. at 24-26.

an award of attorneys' fees in suits against trustees or executors for undue influence.  Id. at 299.

Thus, Niles created an exception to the American Rule in trustee or executor undue influence cases "based on the fiduciary's intentional misconduct regardless of his or her professional status."  Id. at 300.

Underscoring the foundational importance of the finding of undue influence that supported fee-shifting to a fiduciary and his facilitating cohort in Niles, we declined to extend that fee-shifting exception in the circumstances presented in Vayda.  There, a non-attorney executor of an estate was found to have acted negligently and with bad faith in his administration of the estate, but he was not found to have committed undue influence.  Vayda, supra, 184 N.J. at 124.  Reaffirming New Jersey's "strong public policy against" fee shifting, ibid. (quoting Niles, supra, 176 N.J. at 293), the Court unanimously resisted the plea to extend Niles.  The Court pointed out instead that Rule 4:42-9(a)(3) provides a specific remedy in probate actions; attorneys' fees could be paid from the estate. Ibid.

Five years later, our decision in Stockdale, supra, reaffirmed, albeit in dicta, the narrowness of our fee-shifting exception created in Niles.  196 N.J. at 307 (emphasizing that Niles was "directed solely to circumstances in which 'an

16

executor or trustee commits the pernicious tort of undue influence'" (quoting Niles, supra, 176 N.J. at 298)).  The circumstances of Stockdale provide guidance in the present matter.

Stockdale was a wealthy, elderly, reclusive woman in declining health, who had planned to leave much of her estate to a local charity (the first aid squad), when her neighbor Sollitto insinuated himself into her life.  Id. at 284-86.  Through a series of orchestrated acts, Sollitto with help from an attorney friend, Casale, had Stockdale deed her home to Sollitto; amend her will; name Casale the executor of the estate; make Sollitto the residual beneficiary; and forgive the purchase-money mortgage she took when Sollitto purchased her home that covered almost the entirety of the purchase price.  Id. at 290-94.

The trial court found that the will was unenforceable as the product of undue influence.  Id. at 297.  The transfer of Stockdale's home, including the deed and the contract of sale, was also found to be unenforceable.  Ibid.  The trial court reinstated the original will -- the will naming the local charity as the residual beneficiary.  Ibid.  Relying on Niles, the trial court granted the charity attorneys' fees as a form of punitive damages, reasoning that undue influence is a form of intentional tort that can sustain a fee award.  Ibid.  According

17

to the trial court, the fee award was a measure of punitive damages that was necessary to make the estate whole.  Ibid.

The Appellate Division reversed the fee award and "remanded for consideration of an award of punitive damages."  Id. at 298.  The fee award was not supported "under Niles because Stockdale's estate was not financially depleted by Casale's and Sollitto's conduct."  Ibid.

Sollitto, and not the first aid squad, filed a petition for certification, arguing that Niles did not authorize a punitive award.  Id. at 299.  Thus the issue before this Court was not the reversal of the fee award but rather whether punitive damages could be a remedy for the undue influence tort in probate proceedings.

This Court found that punitive damages were available in the probate part in the rare case.  Id. at 304.  We noted that, in the usual undue influence case, "undue influence is not a separately pleaded tort, but is the analytical framework within which the decision about whether to admit a will to probate is made."  Ibid.  The main issue normally is which will to admit to probate.  Ibid.  If none of the competing parties has gained control of the estate, the estate has suffered no loss, and "the only remedy sought is the admission of a particular will to probate."  Ibid.

However, we explained that a tort-based claim for compensatory damages can be asserted when the estate has suffered loss, if, for example, one of the parties has depleted the estate's assets.  Ibid.  Even then, a compensatory award will be rare because equitable relief will usually suffice.  Id. at 304-05.  An executor is generally entitled to a commission based on the value of the estate; but if an executor engages in misconduct, his commission may be surcharged, and his monies offset by the loss he caused the estate.  Id. at 305.  Further, we explained that the surcharge "does not equate with a compensatory award."  Ibid.  When those remedies prove inadequate, a compensatory award, and in turn a punitive award, can be justified.  Id. at 309.

In discussing the availability of punitive damages within a probate setting, we commented on the scope of Niles and identified three considerations that were critical to the fee award there:  (1) that "the claims in Niles were presented by the substitute executor on behalf of the estate" after the fiduciary had been ousted; (2) that the tortious acts were the acts of a fiduciary and had the effect of stripping the estate of virtually all assets, making the usual equitable remedies inadequate; and (3) that the wrongdoing fiduciary actors were "strangers to the natural bounty" of the testator.  Id. at 306.

19

Although the fee-shifting issue was not before it, the Court in Stockdale noted "that Niles created a specific and rather limited exception to the American Rule" and acknowledged that "the Appellate Division quite correctly concluded that the [charity] was not entitled to an award of attorneys' fees." Id. at 312-13.

IV.

Considered collectively, Niles, Vayda, and Stockdale clearly make an existing fiduciary relationship a prerequisite to an estate's recovery of attorneys' fees in a will contest involving undue influence. Since a will contest is the framework for the matter presently before us, Bernice's legal status is critical.

Those who hold the legal title of executor or trustee plainly owe a fiduciary duty to the beneficiaries of the estate or the trust respectively. But there is no dispute on this record that Bernice was not Folcher's executor and that she did not owe a formal fiduciary duty to the Estate or to its beneficiaries.[7] The trial court found that Bernice was in a confidential relationship with only her husband. The term

---

[7] The dissent disregards that key difference between this case and Niles. See post at __ (slip op. at 8). Niles involved the trustee to the estate and his mother, who aided and abetted his conduct. Contrary to the dissent's assertion, that is a meaningful difference.

20

"confidential relationship" has significance in the proofs required for a showing of undue influence in a probate setting.

"[U]ndue influence is a mental, moral, or physical exertion of a kind and quality that destroys the free will of the testator by preventing that person from following the dictates of his or her own mind as it relates to the disposition of assets, generally by means of a will or inter vivos transfer . . . ." Stockdale, supra, 196 N.J. at 302-03. A challenger can set aside a decedent's will or inter vivos transfer on the basis of undue influence. Id. at 302. The burden of establishing undue influence rests with the party contesting the will. Id. at 303. However, "[w]hen there is a confidential relationship coupled with suspicious circumstances, undue influence is presumed and the burden of proof shifts to the will proponent to overcome the presumption." Ibid. That burden can be overcome based on proof of no undue influence by a preponderance of the evidence. Ibid.

In prior case law, we have acknowledged the difficulty in precisely defining a confidential relationship; however, it generally "encompasses all relationships 'whether legal, natural or conventional in their origin, in which confidence is naturally inspired, or, in fact, reasonably exists.'" Pascale v. Pascale, 113 N.J. 20, 34 (1988) (quoting In re Estate of Fulper, 99 N.J. Eq. 293, 314 (Prerog. Ct. 1926)).

21

There is a split of authority on whether a confidential relationship rises to the level of a fiduciary relationship. Some jurisdictions find that the two are essentially one and the same. See Foster v. Ross, 804 So.2d 1018, 1023 (Miss. 2002) (stating that confidential relationship is "fiduciary in character"); Buxcel v. First Fid. Bank, 601 N.W.2d 593, 597 (S.D. 1999) ("A confidential relationship is generally synonymous with a fiduciary relationship." (quoting Crane v. Centerre Bank of Columbia, 691 S.W.2d 423, 428 (Mo. Ct. App. 1985))). Others do not. See Restatement (Third) of Trusts § 2 cmt. b(1) (2003) ("Although the relationship between two persons is not a fiduciary relationship, it may nevertheless be a confidential relationship."). New Jersey is aligned with the latter camp in view of the holding in Pascale, supra, recognizing that a confidential relationship does not quite rise to the level of a fiduciary relationship. 113 N.J. at 34.

That said, no definitive parameter need be set around confidential relationships generally in order to decide this matter. The trial court found that a confidential relationship existed between the married couple, Bernice and her aged and vulnerable husband, Folcher. Bernice's obligation was to Folcher. Her confidential relationship with Folcher did not encumber her with any special duty toward the Estate's beneficiaries. There was no special confidence reposed in

22

Bernice by the other beneficiaries of the Estate. She was a beneficiary herself. That is a critical distinction: Unlike a formal fiduciary setting, "the beneficiary will have no claim in the informal or confidential relationship cases unless she in fact reposes special confidence." Dan B. Dobbs et al., 3 The Law of Torts § 697 at 753 n.28 (2d ed. 2011).

The Niles Court focused on the fiduciary relationship that the trustee or executor owed to the beneficiaries, not the testator. That was justification, at least in part, for making the devastated estate in that matter whole, through the award of attorneys' fees, for the pernicious tort of undue influence committed by the wrongdoing fiduciary. Here, however, Bernice owed no duty to the beneficiaries. Untethered from a duty to the beneficiaries, a fee award in this undue influence setting would be based exclusively on the egregiousness of the undue influence conduct. That is an unwarranted expansion of Niles, which created only a narrow exception to the American Rule. We honor that and decline to expand it here. The absence of a fiduciary relationship, taken with the absence of the Stockdale factors -- Bernice was not a stranger to the natural bounty of the testator -- provide the basis for rejecting the fee award in this appeal.

The trial court mistakenly thought that fee-shifting was available under Niles and used fee-shifting, in lieu of other

23

claims and remedies, to achieve equitable relief for the Estate in this matter. The transcript reveals that the court was troubled by the seeming vexatious and prolonged nature of the litigation, which caused substantial depletion of Estate resources. The fee award coincided with the approximate amount by which this litigation depleted the Estate. The court had findings of fraud and undue influence to work with in crafting an equitable remedy. There was a claim for punitive damages that was not unsupported but was not utilized by the court in view of its other dispositions. We remand this matter to the trial court to vacate the attorney fee award and to reconsider the interwoven relief that the court has available to it to fashion a truly equitable remedy for the circumstances here.

V.

We summarily reject the remaining arguments advanced by petitioner in this appeal. The claim that the trial court's finding of fraud is unsupported, based primarily on the court's failure to refer to the standard of clear and convincing proof when making its finding, is undermined by a fair reading of the court's decisions in their totality. The court, as noted, rendered its finding of undue influence, which was pled as a separate tort in this matter and was not simply background to the will contest over which documents to submit to probate, based on a finding of proof by a clear and convincing standard.

24

The court's recitation of the testimony, documents, and reasoning on which it based its determination of events and conduct by petitioner amply satisfied its findings as to both undue influence and fraud. The proofs overlapped and were sufficient. The burden shifting that occurs in the undue influence analysis did not undermine confidence in the sufficiency of the evidence to support the fraud finding. We think the trial court clearly used the correct standard, as did the Appellate Division in its review. We affirm the Appellate Division's judgment in all respects, except for the attorneys' fees.[8] We add only that the Appellate Division's use of the Rule affirmance format should in no way be fairly perceived to be a failure to consider arguments advanced. See R. 2:11-3(e)(1)(E). Petitioner's expectation of a more explicit explanation for rejection of her arguments defeats the efficiency purpose to the Rule.

VI.

---

[8] We reject petitioner's quarrel with discrete facts that she would like to reargue and similarly her outlandish efforts to cast certain testimony in a different light or give it greater weight than that the trial court did. The trial court's findings have ample sufficient credible evidence in the record to support them. Nothing about the Appellate Division decision undermines the reliability of its judgment or that of the trial court it was reviewing.

The judgment of the Appellate Division is affirmed in part and reversed in part. This matter is remanded to the trial court for further proceedings consistent with this opinion.


CHIEF JUSTICE RABNER, JUSTICES PATTERSON and SOLOMON, and JUDGE CUFF (temporarily assigned) join in JUSTICE LaVECCHIA's opinion. JUSTICE ALBIN filed a separate, dissenting opinion. JUSTICE FERNANDEZ-VINA did not participate.

26

IN THE MATTER OF THE ESTATE
OF ADRIAN J. FOLCHER (a/k/a
ADRIAN J. FOLCHER, JR.),
DECEASED.

JUSTICE ALBIN, dissenting.

The majority accepts the trial court's findings that Bernice Tambascia-Folcher used undue influence to isolate her infirm and dying husband from the children of his first marriage. The majority agrees that, through that undue influence, Bernice engaged in a pernicious scheme to make herself the beneficiary of Folcher's estate, that she forged codicils to his will to advance that scheme, and that she committed a fraud on the estate's heirs. The majority does not dispute that Bernice filed a fake codicil with the probate court, gave false testimony in court, and engaged in fraudulent and frivolous litigation that depleted nearly all the assets of the Folcher estate.

In exercising its equitable powers, the probate court ordered Bernice to reimburse the Folcher estate for the attorney's fees expended in defending against her groundless and deceitful actions. The Appellate Division affirmed this unremarkable decision, relying on In re Niles Trust, 176 N.J.

1

282, 298 (2003).

The majority, astonishingly, reverses this fair and just award against the wrongdoer. The majority claims that the general rule against fee shifting -- the American Rule -- commands the defeat of equity. However, the American Rule is riddled with myriad exceptions based on equity and public policy. Those exceptions are found in our statutes, our Court Rules, and our case law. Indeed, the probate court's ruling is a natural extension of this Court's fee-shifting decisions, including Innes v. Marzano-Lesnevich, __ N.J. __ (2016), issued today. In light of the egregious behavior of Bernice, including her corrupt attempts to deny Mr. Folcher's rightful heirs their patrimony, it is hard to imagine a more justifiable scenario for fee shifting. The majority's remand for further proceedings on the issue of punitive damages will needlessly continue litigation that is sapping the estate's limited assets.

I would uphold the probate court's equitable order requiring Bernice to reimburse the reasonable attorney's fees expended by the Folcher estate in protecting the Folcher children's inheritance from her fraud. I therefore respectfully dissent.

I.

The American Rule is not a sacred creed. Fee-shifting statutes, court rules, and case law are now a commonplace part

2

of our civil justice system's efforts to promote equity, deter wrongful conduct, and encourage lawyers to undertake cases that further the public interest.

A.

The Legislature has enacted numerous statutes that allow for fee shifting for the public good. See, e.g., N.J.S.A. 2A:15-59.1(a) (allowing attorney's fees for prevailing party in frivolous actions); N.J.S.A. 2A:18-61.1e (allowing attorney's fees for evicted tenant not given proper notice of owner's intention to return property to residential use); N.J.S.A. 2A:18-61.6 (allowing attorney's fees for wrongfully evicted tenant); N.J.S.A. 2A:23B-25 (allowing attorney's fees at court's discretion to prevailing party in contested arbitration award); N.J.S.A. 2A:34-25 (allowing attorney's fees incurred as result of opposing party's failure to comply with notice provisions of alimony-termination statute); N.J.S.A. 10:5-27.1 (allowing attorney's fees to prevailing party in successful Law Against Discrimination actions and in unsuccessful Law Against Discrimination actions brought in bad faith); N.J.S.A. 10:6-2 (allowing attorney's fees to prevailing party in claims pursuant to New Jersey Civil Rights Act); N.J.S.A. 17:33A-7 (allowing attorney's fees to insurance company damaged by violation of Insurance Fraud Prevention Act); N.J.S.A. 19:31-29 (allowing attorney's fees to prevailing party where Secretary of State

3

fails to respond to alleged election violations within timeframe designated by statute); N.J.S.A. 34:11B-12 (allowing attorney's fees to prevailing party in action pursuant to Family Leave Act); N.J.S.A. 34:19-5 (allowing attorney's fees to prevailing plaintiff in claim under Conscientious Employee Protection Act); N.J.S.A. 34:19-6 (allowing attorney's fees to defendant under Conscientious Employee Protection Act where claim is baseless and employee does not file voluntary dismissal within reasonable time after discovering this); N.J.S.A. 45:1-25 (allowing attorney's fees to State in action pursuant to Health Care Professional Responsibility and Reporting Enhancement Act); N.J.S.A. 52:4C-5 (allowing attorney's fees to prevailing party in successful action for mistaken imprisonment); N.J.S.A. 56:9-10(b) (allowing attorney's fees to plaintiff where court issues permanent injunction pursuant to New Jersey Antitrust Act); N.J.S.A. 56:12-85 (allowing attorney's fees to consumer in successful claim under Consumer Protection Leasing Act); N.J.S.A. 59:9-5 (allowing attorney's fees to successful claimant under Tort Claims Act).

B.

Our Court Rules also permit fee shifting in a number of defined instances. See generally R. 4:42-9; Innes, supra, __ N.J. at __ (slip op. at 12). For example, attorney's fees are permissible out of a decedent's estate when "probate is refused"

4

or when a "contestant had reasonable cause for contesting the validity of the will or codicil." R. 4:42-9(a)(3). Admittedly, the court rule does not provide for attorney's fees in the precise circumstances of this case. The logic of the rule, however, applies perfectly here. Folcher's heirs have established more than a "reasonable cause for contesting the validity of the will or codicil." The rightful heirs have exposed the wrongdoing of a party who presented a fraudulent codicil -- a party whose corrupt conduct has depleted the estate's assets. Unless Bernice is made to reimburse the attorney's fees expended by the estate in this case, there may be no assets left to distribute. Our Court Rules are "construed to secure a just determination, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." R. 1:1-2(a). To the extent our current rules do not cover the egregious wrongdoing in this case, this Court is empowered to amend the rules and regularly does so to further promote justice and fairness. See Pressler & Veniero, Current N.J. Court Rules viii-xii (Gann 2016).

C.

Importantly, this Court has not hesitated to add exceptions to the American Rule when "the interest of equity [has] demand[ed] it." Niles, supra, 176 N.J. at 298 (alteration in original) (quoting In re Estate of Lash, 169 N.J. 20, 43 (2001)

5

(Verniero & LaVecchia, JJ., dissenting)). We permit fee shifting in attorney malpractice actions to make the client whole -- because the cost of retaining counsel constitutes consequential damages. Saffer v. Willoughby, 143 N.J. 256, 272 (1996). We also have permitted an award of attorney's fees in an action against an attorney who intentionally violated his fiduciary duty to a client, Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 442-43 (2001), in an action against the administrator of an estate who misappropriated the estate's funds, Lash, supra, 169 N.J. at 23, and in an action against a trustee of an estate who exercised undue influence over a testator, Niles, supra, 176 N.J. at 298-99. Most recently, this Court held that a counsel-fees award can be entered against an attorney who intentionally breaches her fiduciary duty to honor an escrow agreement that benefits a non-client. Innes, supra, __ N.J. at __ (slip op. at 20-21).

## II.

### A.

The American Rule serves the laudable purpose of promoting access to our courts by ensuring litigants that, if they lose their case, they will not have to pay the prevailing party's legal fees. See Niles, supra, 176 N.J. at 294. The prospect of potentially ruinous legal fees, understandably, will discourage litigation brought in good faith. On the other hand, our

6

developing common and statutory law recognize that through fee shifting the "victims of perfidious behavior" can be made whole, id. at 296, and that frivolous and fraudulent litigation can be deterred, Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 172-73 (2006) (noting that statutory award of attorney's fees, in part, is intended to deter such conduct). In considering whether to carve out an exception to the American Rule, we must weigh those competing principles. The American Rule is a common-law principle, not an unalterable commandment. The common law is an expression of public policy and social values. See Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 435 (1993). As our public policy matures and our social values evolve, so must the common law, ibid., and so must the American Rule.

In Niles, supra, the Court understood that the equitable remedy of counsel fees might be required in "the unique circumstances" of a case, even in the absence of an applicable statute or court rule. 176 N.J. at 296-97. Niles, like the present case, was litigated in the probate court -- a court of equity. In Niles, a mother and son "unduly influenced" an eighty-eight-year-old single woman suffering from dementia to name the son the trustee of three inter vivos trust agreements. Id. at 286. With the former trustee removed, the mother and son manipulated the elderly woman "to confer upon them substantial economic benefits under the altered trust agreements." Ibid.

7

We held the mother-son team responsible for all reasonable counsel fees incurred by the parties who litigated "to restore the estate's assets to what they would have been had the undue influence not occurred."  Ibid.

We explained in Niles that "undue influence" is "a form of fraud" and is "an egregious intentional tort that . . . establishes a basis for punitive damages in a common law cause of action."  Id. at 300.  We concluded that "the undue influence exception [to the American Rule] does not violate the purposes" underlying the Rule.  Ibid.

B.

There is no meaningful distinction between Niles and the present case.  Indeed, the fraud here exceeded the typical undue influence scenario in which, through "mental, moral or physical exertion," the wrongdoers overcome "the free agency of a testator."  See id. at 299 (quoting Haynes v. First Nat'l State Bank of N.J., 87 N.J. 163, 176 (1981)).  The probate court in this case found that Bernice "committed acts of undue influence when she compelled [Folcher] to transfer assets/personal property during the last week of his life."  The court also determined that Bernice "committed fraud and forgery in the making and/or execution of" the two codicils and deed to the marital home.

Unlike the present case, in Niles one of the wrongdoers --

8

the son -- wangled his way into the role of trustee to exert his undue influence.  Id. at 286.  His non-trustee scheming mother, however, was made jointly and severally liable for counsel's fees.  Ibid.

Bernice admittedly was not the executor of her husband's estate.  Nevertheless, as Folcher's wife, she used her confidential relationship to exert egregious undue influence over her infirm and isolated husband.  She also engaged in intentional misconduct by fraudulently creating documents for the purpose of defrauding Folcher's rightful heirs.  And, to that end, she filed false documents with the probate court to corrupt the civil justice system.

As in Niles, the issue here is whether "the unique circumstances of this case" call for the equitable remedy of an award of attorney's fees.  Id. at 296.

IV.

The majority's inflexible approach to the American Rule in this case is at odds with the evolving ethos of our common law. The Folcher estate's assets have been depleted by having to fend off Bernice's bogus legal claims.  The attorney's fees incurred represent consequential damages suffered by Folcher's rightful heirs.  Shifting attorney's fees, moreover, advances the public policy of deterring the type of wrongful conduct that occurred here.  This case more than qualifies as a sensible exception to

9

the American Rule.

Remanding this case for further proceedings relating to punitive damages will lead to more wasteful litigation for an estate with limited assets.  It is pointless to award punitive damages in place of awarding the consequential damages of attorney's fees suffered by the estate.  To the extent that attorney's fees are intended to deter and punish, they serve the purpose of punitive damages in this case.  See Land, supra, 186 N.J. at 185 (Albin, J., dissenting).  I cannot agree to the majority's exaltation of form over substance, making attorney's fees impermissible while allowing for punitive damages.

The majority has undone an equitable ruling that made whole the victims of Bernice's fraud.  I would end the litigation today and affirm the judgment of the Appellate Division, requiring Bernice to reimburse the Folcher estate for the attorney's fees expended as a result of her egregious misconduct.  I therefore respectfully dissent.

10

SUPREME COURT OF NEW JERSEY

NO. __A-3____                        SEPTEMBER TERM 2014

ON CERTIFICATION FROM _____Appellate Division, Superior Court_____


IN THE MATTER OF THE ESTATE
OF ADRIAN J. FOLCHER (a/k/a
ADRIAN J. FOLCHER, JR.),
DECEASED.


DECIDED _____April 26, 2016_____

_____Chief Justice Rabner_____   PRESIDING

OPINION BY _____Justice LaVecchia_____

CONCURRING/DISSENTING OPINION BY _____

DISSENTING OPINION BY ____Justice Albin_____

| CHECKLIST | AFFIRMED/ REVERSED/ REMANDED | DISSENT |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | | X |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | ---------------- | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 5 | 1 |