**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3275-14T4
                     A-3286-14T4

JAMES S. COHEN, as Trustee of
the Robert B. Cohen Living Trust,

     Plaintiff-Appellant,

v.

SAMANTHA O. PERELMAN,

     Defendant-Respondent.

_____

IN THE MATTER OF THE ESTATE
OF ROBERT B. COHEN,

     Deceased.

_____

JAMES S. COHEN, as Trustee of
the Robert B. Cohen Living Trust,

     Plaintiff-Respondent,

v.

SAMANTHA O. PERELMAN,

     Defendant-Appellant.

_____

IN THE MATTER OF THE ESTATE
OF ROBERT B. COHEN,

  Deceased.

_____

Argued October 18, 2017 – Decided November 19, 2018

Before Judges Alvarez, Nugent, and Geiger.

On appeal from Superior Court of New Jersey, Chancery Division, Bergen County, Docket Nos. C-000094-12 and P-000211-12.

Benjamin Clarke argued the cause for appellant in A-3275-14 and respondent in A-3286-14 (DeCotiis, FitzPatrick, Cole & Giblin, LLP, attorneys; Benjamin Clarke and Erik M. Corlett, on the briefs).

Edward A. Friedman (Friedman Kaplan Seiler & Adelman LLP) of the New York bar, admitted pro hac vice, argued the cause for respondent in A-3275-14 and appellant in A-3286-14 (Friedman Kaplan Seiler & Adelman LLP, Greenbaum Rowe Smith & Davis LLP, Edward A. Friedman and Jeffrey C. Fourmaux (Friedman Kaplan Seiler & Adelman LLP) of the New York bar, admitted pro hac vice, and Brown & Connery, LLP, attorneys; Robert J. Lack, Alan S. Naar, Edward A. Friedman, and Jeffrey C. Fourmaux, on the briefs).

PER CURIAM

Robert Cohen (Cohen), a man of great wealth, suffered for years from a rare and progressive form of Parkinson's disease, and died at age eighty-six on

2

February 1, 2012. His son James Cohen[1] thereafter filed a complaint in Chancery seeking, among other things, a declaratory judgment that Cohen's July 17, 2009 will, as subsequently modified, was valid and enforceable. About two months later, Cohen's granddaughter, Samantha O. Perelman, filed a verified complaint alleging that all of Cohen's wills and testamentary trusts after her mother Claudia's death in 2007 were the product of undue influence and were therefore invalid. She later amended her complaint, alleging that the earlier 2007 will and trust also resulted from James's undue influence, and that an earlier 2004 will, trust, and codicil were the documents that should be probated. After extensive pretrial motion practice, the consolidated actions were tried over seven months, during which fifty experts and fact witnesses testified. Judge Estela M. De La Cruz rendered a comprehensive and cogent 119-page written decision on June 24, 2014, upon which we principally rely in issuing our affirmance.

At the close of Samantha's case-in-chief, the trial judge ruled that Samantha was entitled to a presumption of undue influence. In accord with well-established precedent, the ruling shifted the burden of proof to James to refute the presumption with clear and convincing evidence. The court reserved

---

[1] We refer to Cohen's wife, children and grandchildren by their first names to avoid confusion.

decision on Samantha's further allegation that James's undue influence had caused Cohen to allow two substantial life insurance policies, naming Claudia as beneficiary, to lapse.

The judge's decision, which we more fully describe as necessary in the relevant portion of this opinion, dismissed Samantha's claims in their entirety. The judge granted declaratory judgment that Cohen's last will and testament consisted of the July 2009 will, the March 2010 Fifteenth Amendment, and the December 2010 First Amendment. Because she found James had not exerted undue influence, all other wills and trust documents were therefore null and void.

The court also assigned the discovery master the further task of reviewing Samantha's demand for $23.5 million in legal fees and denied James's demand for frivolous litigation sanctions. After consideration of the master's report on fees, rendered months after exhaustive submissions by the several firms representing Samantha and James, the court allowed $10,578,101 in fees and costs. See R. 4:42-9(a)(3). We affirm the judge's decision regarding dismissals, the declaratory judgment, as well as the request for legal fees.

The parties previously engaged in protracted litigation related to Cohen's holdings in this and other jurisdictions. In New Jersey alone, this includes: In

re Cohen, No. A-5852-08 (App. Div. July 5), certif. denied, 208 N.J. 371 (2011); Estate of Cohen v. Booth Computers, 421 N.J. Super. 134 (App. Div.), certif. denied, 208 N.J. 370 (2011); Estate of Cohen v. Cohen, Nos. A-0713-10, A-0864-10, and A-0941-10 (App. Div. Oct. 3, 2013), certif. denied, 217 N.J. 287 (2014); and Estate of Cohen v. Estate of Cohen, No. A-3779-13 (App. Div. Mar. 7), certif. denied, 226 N.J. 212 (2016).

Additionally, the parties have litigated Cohen's estate in federal court, and in Florida and New York: Estate of Cohen v. Cohen, Civil No. 09-2281 (JJL) (D.N.J. Mar. 16, 2010); In re Petition of Perelman, File No. 2318/2007 (Surrogate Ct., Cty. of N.Y. June 4, 2010); and In re Estate of Cohen, File No. 50-2012-CP000819-XXXXMB (Probate Div., Palm Beach Cty., FL Feb. 21, 2012).

Cohen's two sons, James and Michael, always worked in the family business enterprises. Claudia and her father enjoyed an excellent relationship up to her death on June 15, 2007. Until she became too ill to do so, she assisted in her parents' care. Additionally, Claudia had a career independent of the family businesses, in which she never worked. Claudia married Ronald Perelman, also a man of great wealth, and their only child is Samantha, born June 1990. Although Claudia and Perelman divorced, she named him the

executor of her estate. Michael predeceased Claudia on June 30, 1997, leaving a son, Michael Spencer Cohen, born July 1994, who became a part of James's household when his mother also died.

The parties have engaged in bitter and protracted years of litigation, beginning after Claudia's death but before Cohen's. In 2008, Perelman, acting on behalf of Claudia's estate, later joined by Samantha when she reached the age of majority, alleged Cohen had breached an oral promise to divide his estate equally among his three children. The complaint also alleged Cohen was incompetent and required the appointment of a guardian ad litem, and that James exerted undue influence on his father, based on Cohen's substantial inter vivos transfers to him. The 2009 decision by Judge Ellen Koblitz laid the groundwork for this opinion.

Because Perelman and Samantha averred that Cohen was not competent, Judge Koblitz bifurcated the trial. She first addressed the issue of Cohen's mental capacity and the necessity for a guardian, and on June 1, 2009, she concluded that although his illness slowed Cohen's thought processes and he had difficulty communicating, he was functionally competent. On June 15, 2009, the judge found that Perelman and Samantha had failed to prove that pre-

September 1, 1978, Cohen had made an enforceable promise to Claudia to divide his estate equally among his children.

On June 26, 2009, Judge Koblitz found that Cohen was not legally incapacitated. She noted: "for [Cohen] to be the subject of this many medical examinations of such extensive length was in my view tremendously burdensome to him." On two occasions she observed Cohen's trial testimony first-hand, and she also watched his videotaped deposition testimony. She observed:

> He is 84 years old. He has a very limited quality of life. He seems to have rather an amazing personality and strength of will which was described by various witnesses as "courageous," in that he does seem to find enjoyment in his life, as restricted as it is. He enjoys his plane, flying to Florida, smoking his cigar, hearing about horse racing, watching politics on television. He seems to enjoy hearing about this case.

The judge further observed that Cohen did "not view any danger or risk coming from his one living child."

Having found Cohen competent, in an August 19, 2009 written opinion, Judge Koblitz dismissed the remaining counts of the amended complaint. Estate of Cohen v. Cohen, No. BER-C-134-08 (Ch. Div. Aug. 19, 2009) (slip op. at 11), aff'd in part & remanded in part, Estate of Cohen, Nos. A-0713-10, A-0864-10, and A-0941-10. This included the claim of undue influence:

> The facts presented here do not persuade this Court to make new law in this state by allowing an attack on the choice of a living donor, with capacity, to transfer his assets prior to death. Robert is not incapacitated, and as long as Robert has capacity he may both alter his will and transfer his assets.
>
> [Id. at 8.]

We affirmed the decision, except as to counsel fees. Estate of Cohen, Nos. A-0713-10, A-0864-10, and A-0941-10 (slip op. at 3-4). The Supreme Court denied certification.

On February 8, 2012, shortly after Cohen's death, James submitted to the Surrogate his father's July 17, 2009 will and the two related testamentary instruments.[2] On February 21, 2012, the Surrogate accepted the July 2009 will for probate.

Turning back to this dispute, with the 2009 litigation as backdrop, by the time Cohen passed away, the business was almost entirely outside of his estate. As James explained:

> This was his plan. His plan had been more successful than he ever could have dreamed. He used his professionals to implement those plans. And—and

---

[2] References to Cohen's "will" include both his last will and testament and a companion living trust, including amendments and restatements of the trust agreement. As the trial court explained in its opinion dated June 24, 2014, "each time a new Will was executed, a restated Trust Agreement was simultaneously executed."

his goal of keeping this business going and having me, his son who worked with him for 30 years, be his successor was—was—was successful. This is what he wanted, and that's why it was fair to him.

According to James, his father had excellent relationships with Claudia and Samantha, but in October 2008 his father was saddened after Samantha prepared an affidavit saying her grandfather was "not of sound mind, or something to that effect." In May 2009, Cohen was angered when Samantha and her father filed a civil complaint against James, alleging he had defrauded federal and state tax authorities in violation of the New Jersey Racketeer Influenced and Corrupt Organizations (RICO) Act, N.J.S.A. 2C:41-1 to -6.2.

The trial judge in this case observed that "somewhere between 70-80% of the time spent on this trial was consumed by testimony and related evidence concerning the contested inter vivos transfers, while significantly less time was spent, in comparison, on the contested Wills and other testamentary instruments." The proceedings were an "intense challenge considering the unyielding advocacy fed by unlimited funds." She concluded:

> Robert Cohen's intentions were clear that he wanted to pass the Cohen family business, Hudson Media, Inc., on to his son, James Cohen, and the 2009 Final Will (and Trust) fulfills that objective;
>
> Changes to the 2009 Final Will to remove Samantha Perelman from the residuary and reduce her bequest in

the Palm Beach residence to a lifetime twenty-one day-per-year use license, were consistent with specific recommendations made to Robert Cohen by his attorneys during an April 2, 2009 meeting and there is no evidence that James Cohen was privy to or that he suggested these changes;

Robert Cohen made these changes at his own discretion and by his own free will in response to prior bitter litigation with his granddaughter and ex son-in-law;

Although Robert Cohen suffered from severe physical disabilities due to a form of Parkinson's disease, his cognitive abilities were largely intact, and he could still speak and communicate, albeit with difficulties, up until and beyond the date when the 2009 Final Will was executed on July 17, 2009;

Robert Cohen was legally competent and had the required testamentary capacity to make changes to his 2009 Final Will as ruled by Judge Koblitz just weeks before the 2009 Final Will was executed, and [h]is competency was further supported by the evidence presented at this trial concerning the time period leading up to the Final Will's execution;

The relationship between James Cohen and Robert Cohen was harmonious and remarkably free from any conflicts, disagreements or arguments;

Robert Cohen's personality, despite his Parkinson's disease, remained as it was, strong-willed and determined, resisting even medical advice in doing what he wanted for pleasure despite his ailments; and

James Cohen had a tremendous amount of deference to his father and there is no evidence whatsoever that James attempted to "coerce" or "dominate" his father

10

and, most likely, could not have done so even if he had wanted.

The court found that, with the execution of the July 2009 will, the earlier contested wills and testamentary instruments were rendered null and void. Consequently, the court found it was "unnecessary to probe back beyond the valid 2009 Last Will and Testament."

The trial judge also dismissed Samantha's claims of undue influence over the contested inter vivos transfers and related transactions executed between 2001 and 2008. She found that Samantha was

> not a beneficiary to the residuary estate under the 2009 Final Will. As noted, any judgment to restore any or all of the inter vivos transfers of business assets, or their monetary equivalent, to the estate of Robert Cohen, as [Samantha] argues should be done, would become part of the residuary estate, because there are no specific bequests in the 2009 Final Will that would govern how these restored funds would be bequeathed. Accordingly, with the 2009 Last Will validated and with [Samantha] having no claim on the residuary estate, [Samantha], therefore, has no standing to assert a claim on the inter vivos transfers she contests.

Thus, the trial court denied as moot Samantha's claim that James must return to his father's estate an estimated $384.4 million in cash allocated to him from the Advent International (Advent) acquisition of the Cohen family's airport retail business in March 2008, and dismissed other transactions totaling millions.

11

The court found that Cohen had purchased two insurance policies in 2003 with the goal of supplementing his daughter's income when her alimony payments ended in 2008. After Claudia's death, Cohen did not want to be responsible for the premiums on the policies, claiming they "were for Claudia, not Samantha." The court relied on trial testimony that after the accrued cash value was gone, despite the fact James favored continuing the policies, Cohen refused to do so after his daughter's death. This evidence was consistent with Cohen's intent to provide for his surviving children. The judge dismissed Samantha's claim that James unduly influenced his father to allow the two insurance policies to lapse.

The court further dismissed Samantha's claim that in December 2007 James unduly influenced his father to change a $5 million insurance policy from a trust for Claudia and Samantha, to include James's four children instead. The change in beneficiaries occurred around the same time as changes in a November 2007 will, which Cohen made in response to a dinner meeting with Samantha. Given the generous bequests he made to Samantha in the November 2007 will, the court found nothing particularly suspicious about the alteration.

On appeal, Samantha raises the following points:

> I.      [COHEN'S] ATTORNEY WAS CONFLICTED, THUS REQUIRING JAMES TO REBUT THE

PRESUMPTION OF UNDUE INFLUENCE OVER [COHEN'S] WILLS BY CLEAR AND CONVINCING EVIDENCE.

II. JAMES FAILED TO REBUT THE PRESUMPTION OF UNDUE INFLUENCE OVER THE JULY 2009 WILL.

    A.    The Trial Court Erred in Considering the July 2009 Will in Isolation from the Successive Changes to [Cohen's] Wills That Began When James Became Involved.

    B.    James Failed to Rebut the Presumption of Undue Influence Created by the Provisions of the July 2009 Will, Including Those Carried Over from Prior Wills James Was Involved In, and by James's Prior Acts.

        1.    The Provision Purporting to Nullify Any Court Judgment Against James.

        2.    James and Kochman's Thwarting of [Cohen's] Intent for Samantha's Share of the Palm Beach Residence.

        3.    Shifting Monetary and Other Non-Business Bequests from Samantha to James.

        4.    Reduction and Removal of Samantha's Interest in [Cohen's] Residuary Estate.

        5.    Eliminating Loan Forgiveness for Claudia but Not James.

13

C. The Court's Reasons for Concluding James Rebutted the Presumption of Undue Influence Were Based on Legal Errors and Not Supported by Substantial Evidence.

1. An Intent to Bequeath Business Assets to James Does Not Explain Why [Cohen] Would Change His Will to Take Non-Business Assets from Samantha and Give Them to James.

2. Conflicted Counsel's Involvement in Stripping Samantha's Residuary Bequest from the 2009 Will Did not Cleanse, But Rather Tainted, That Change.

3. Alleged Bitterness Over Litigation Does Not Explain Changes That Preceded Any Litigation.

4. [Cohen's] Communicative Abilities and Capacity Did Not Negate Undue Influence, Because Capacity and Undue Influence Are Distinct Legal Concepts.

5. The Trial Court's Findings about [Cohen's] and James's Personalities and Their Relationship Were Not Supported by Substantial Evidence.

III. THE TRIAL COURT ERRED IN ITS ANALYSIS OF THE NOVEMBER 2007 WILL.

IV. THE TRIAL COURT'S FINDINGS CONCERNING SAMANTHA'S INTER VIVOS CLAIMS RESTED ON LEGAL ERRORS.

14

A.    Samantha Has Standing to Challenge the Inter Vivos Transactions.

B.    The Trial Court Erroneously Held It Was Irrelevant Whether the Inter Vivos Transactions Were Unfair.

C.    The Trial Court Legally Erred in Rejecting Samantha's Tax Expert.

By way of separate appeal, James challenges the counsel fee award of $9,539,626 and costs of $1,038,475—a total of $10,578,101:

POINT I
THE TRIAL COURT ERRED IN FAILING TO CONSIDER AND FOLLOW THIS COURT'S RILEY DECISION, AND IN ORDERING [COHEN'S] ESTATE TO PAY $10.6 MILLION TO, OR FOR THE BENEFIT OF, RONALD O. PERELMAN, A NON-PARTY TO THE LITIGATION WITH NO INTEREST IN [COHEN'S] ESTATE.

POINT II
THE TRIAL COURT ERRED IN REFUSING TO ALLOW DEFENDANTS TO BE HEARD ON WHETHER AN AWARD SHOULD BE MADE.

POINT III
THE TRIAL COURT ERRED IN FAILING TO IMPOSE ANY PENALTY FOR THE GROSS EXCESSIVENESS OF PLAINTIFF'S $23.5 MILLION APPLICATION.

POINT IV
THE TRIAL COURT ERRED IN AWARDING FEES FOR THE 70%-80% OF THE CASE THAT IT

15

ACKNOWLEDGED TO BE NON-PROBATE IN NATURE AND SUBSTANCE.

POINT V
THE TRIAL COURT FAILED TO IMPOSE ADEQUATE DISCOUNTS FOR LACK OF SUCCESS, OVERSTAFFING, UNPRODUCTIVE WORK, IMPROPER BILLING AND LACK OF BENEFIT TO THE ESTATE.

POINT VI
THE ESTATE OF ROBERT COHEN SHOULD NOT HAVE TO PAY ANY FEES FOR WORK PERFORMED BY THE FRIEDMAN FIRM, WHICH GAINED AND RETAINED ITS PRO HAC ADMISSION BY CONCEALING A DISQUALIFYING CONFLICT OF INTEREST.

We first address Samantha's points on appeal.

I.

Samantha contends that the court did not find by clear and convincing evidence that James countered the presumption of undue influence. She anchors the claim on the alleged conflicts of interest of Cohen's advisors over years of transfers, among other factors. To the contrary, we conclude the judge did find James had met his burden of proof by clear and convincing evidence, and the record did provide ample support for her conclusion.

It is presumed that a testator was competent and of sound mind when he or she executed a will. Haynes v. First Nat'l State Bank of N.J., 87 N.J. 163,

16

175-76 (1981).  A will, however, may be overturned if tainted by undue influence.  Id. at 176.

"[U]ndue influence is a mental, moral, or physical exertion of a kind and quality that destroys the free will of the testator by preventing that person from following the dictates of his or her own mind as it relates to the disposition of assets, generally by means of a will or inter vivos transfer . . . ."  In re Estate of Folcher, 224 N.J. 496, 512 (2016) (alteration in original) (quoting In re Estate of Stockdale, 196 N.J. 275, 302-03 (2008)).  It represents conduct that causes a testator to accept another person's domination or influence, rather than follow his or her own wishes.  Stockdale, 196 N.J. at 303.

The party contesting the will has the burden of establishing undue influence.  Folcher, 224 N.J. at 512.  If the will benefits someone who stood in a confidential relationship to the testator and if there are additional suspicious circumstances, a different presumption arises—that the proponent of the will exerted undue influence.  Ibid.  The burden of proof shifts to the proponent of that will to overcome the presumption.  Ibid.  When the burden shifts, the will proponent can overcome the presumption by a preponderance of the evidence.  Ibid.

There are circumstances, however, "where the presumption of undue influence is so heavily weighted with policy that the courts have demanded a sterner measure of proof . . . ." Haynes, 87 N.J. at 178 (quoting In re Estate of Weeks, 29 N.J. Super. 533, 539 (App. Div. 1954)). Generally, courts require the higher burden of proof when the attorney who drafted the will has a conflict of interest. Pascale v. Pascale, 113 N.J. 20, 35-38 (1988). Where an attorney has a professional conflict of interest, and the testator, beneficiary, as well as the attorney have confidential relationships, the proponent of the will must rebut the presumption of undue influence by clear and convincing evidence. Stockdale, 196 N.J. at 303; Haynes, 87 N.J. at 183. Even where a testator did not have independent counsel, and a confidential relationship existed, the real issue is whether the testator understood the consequences of his actions. Pascale, 113 N.J. at 37-39. In this case, the trial judge applied the higher standard of proof given the testator's unique circumstances. The judge held the testator absolutely understood his actions—his business and estate plans, and his intent to engage in tax planning while benefitting the child with whom he had worked for over thirty years.

The trial court found James had rebutted the presumption by both a preponderance of the evidence and by clear and convincing evidence. A trial

judge may make alternative findings. See State ex rel. Y.C., 436 N.J. Super. 29, 40-41 (App. Div. 2014) (remanding with directions that the administrative law judge make alternative findings as to whether the Juvenile Justice Commission proved its case by clear and convincing evidence and, if not, by a preponderance of the evidence). Here, the trial judge considered both standards. The proofs supported her factual findings and legal conclusions.

II.

In her second point, Samantha contends the court erred by finding James did not exert undue influence upon his father regarding the July 2009 will. She argues the court improperly considered the July 2009 will in isolation from Cohen's earlier wills, failed to address his new and carryover provisions from prior wills that were to James's benefit and to her detriment, and made factual findings unsupported by evidence or law. We do not agree.

In its written decision, the court reiterated the reasons it decided to shift the burden of proof to James: that Samantha had presented sufficient evidence of a confidential relationship and evidence of suspicious circumstances. The timing of the changes to Cohen's testamentary instruments, given the progression of his disease and the changes to those documents, created a presumption of undue influence.

19

The court then considered whether James met his burden to rebut the presumption as to the July 2009 will. It found that Cohen intended to pass the family business to James, remove Samantha from the residuary estate, and reduce her bequest in the Palm Beach residence based on recommendations by his attorneys at an April 2009 meeting outside James's presence. Additionally, Cohen made these changes in response to the prior bitter litigation pursued by Samantha and her father. At the time of the July 2009 will's execution, Cohen had the ability to communicate, had the required testamentary capacity, had a relationship with James that was "remarkably free from any conflicts," and had retained his strong personality. James had "a tremendous amount of deference to his father" and he likely could not have coerced or dominated his father, even if he had wanted to do so. The witnesses universally described Cohen as someone who knew what he wanted. Even Perelman described Cohen as someone who would not react well to threats. The evidence showed that Cohen controlled James, not the reverse.

Additionally, the court found James credible, "although maybe a bit defensive at times." It observed that he was "mild-tempered, [c]ourteous and, at all times, a gentleman." He was not "pompous in words" and "did not appear to exaggerate." "In short, he appeared to be a good complement to his father's

more autocratic and confident personality." The only evidence out of character was a March 2007 email in which James suggested holding a meeting away from the offices, because his "ailing father might 'show up' out of the blue and change the complexion of the meeting." This one communication did not "even dent" the overwhelming evidence from all witnesses for both parties that the father-son relationship was sound and respectful. The email implicitly recognized Cohen's strong character and the control he exercised at meetings he attended.

Based on its findings, the court concluded that James had rebutted the undue influence presumption. Hence the July 2009 will was Cohen's true and valid last will and testament. The March and December 2010 amendments lacked new language or changes that would have affected the bequests to Samantha.

Not all influence is undue. In re Will of Livingston, 5 N.J. 65, 73 (1950). Mere suggestions, persuasions, or the possession of influence and the opportunity to exert it, are not sufficient to find undue influence. In re Will of Liebl, 260 N.J. Super. 519, 528 (App. Div. 1992) (quoting Livingston, 5 N.J. at 73). A court also will not set aside a will solely because it is unequal or unjust. Id. at 529. "[A] testator is not required to divide his or her estate evenly among his or her children and may even exclude a child or family member completely."

Ibid. Each case requires an analysis of the particular facts and circumstances surrounding the execution of the will and the conduct of the parties who participated. Livingston, 5 N.J. at 73.

To establish a presumption of undue influence, the opponent of the will must prove the existence of a confidential relationship coupled with suspicious circumstances. Stockdale, 196 N.J. at 303. A confidential relationship is present if the testator either "'by reason of . . . weakness or dependence,' reposes trust in the particular beneficiary, or if the parties occupied a 'relation[ship] in which reliance [was] naturally inspired or in fact existed.'" Ibid. (quoting In re Estate of Hopper, 9 N.J. 280, 282 (1952)). "Among the most natural of confidential relationships is that of parent and child." Pascale, 113 N.J. at 34. To determine whether a confidential relationship exists, the test is "whether the relations between the parties are of such a character of trust and confidence as to render it reasonably certain that the one party occupied a dominant position over the other and that consequently they did not deal on terms and conditions of equality." Estate of Ostlund v. Ostlund, 391 N.J. Super. 390, 402 (App. Div. 1952).

The contestant of a will also must establish suspicious circumstances, however "slight." Stockdale, 196 N.J. at 303; Pascale, 113 N.J. at 30; Haynes,

87 N.J. at 176. Suspicious circumstances may arise from a "drastic change in the testamentary dispositions" of the testator. Haynes, 87 N.J. at 177. "When there is a confidential relationship coupled with suspicious circumstances, undue influence is presumed and the burden of proof shifts to the will proponent to overcome the presumption." Stockdale, 196 N.J. at 303.

Samantha contends the court erred by failing to consider whether James's exertion of undue influence over the 2007 and 2008 wills tainted the July 2009 will. She argues that incremental changes in Cohen's wills began in February 2007, that most were made prior to the July 2009 will, and that the changes, along with inter vivos transactions during the same period, reduced her inheritance from "over $400 million to zero."

The court rejected Samantha's argument about the validity of the prior testamentary instruments. It found no merit in claims of undue influence over the earlier contested wills, including the February 2007 will, the November 2007 will, and the October 2008 will. With the execution of the July 2009 will, and with its ruling that James had rebutted the presumption of undue influence, all prior testamentary instruments were rendered null and void. Thus, Samantha could not assert a claim attacking a prior will.

A challenger can prove undue influence by direct evidence or infer its presence from facts and circumstances. In re Estate of Raynolds, 132 N.J. Eq. 141, 151 (Prerog. Ct. 1942), aff'd, 133 N.J. Eq. 346 (E. & A. 1943). It is not necessary to prove that undue influence was exercised at the exact time of execution of the will. Id. at 151-52. However, "whenever exerted, whether months or years before, [the undue influence] must still be operative upon the testator's mind in the very act of executing the instrument and be an effective cause of the disposition made therein." Id. at 152 (quoting In re Everett's Will, 166 A. 827, 830 (Ut. 1933)). Raynolds held that even if the court inferred undue influence over the years by the plaintiff's stepmother, there was no evidence that at the time of the will's execution she controlled the decedent's mind or will. Id. at 153-54. Despite its ultimate conclusion that the 2009 will rendered prior wills null and void, the court discussed Cohen's prior wills and said it "examined very closely the actual contents of the Wills, the related Trusts and the attendant circumstances, particularly the 2004 Will and Trust that plaintiff seeks to revive, as well as all the Will[s] through the last one executed in 2009 which [Samantha] contests."

A trial court's factual findings are accorded deference if they are supported by substantial credible evidence. Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of

Am., 65 N.J. 474, 484 (1974); Liebl, 260 N.J. Super. at 524. Such findings are entitled to great weight because the trial court had the opportunity to see and hear the witnesses and form opinions about the credibility of their testimony. Livingston, 5 N.J. at 78. We review de novo questions of law and the legal consequences that flow from the established facts. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The record supports the trial judge's findings and conclusions of law. For example, in his September 2008 affidavit, Cohen said he did not need anyone to do his thinking or make his estate-planning decisions, explaining he could read with complete understanding. He added that the claim of undue influence with respect to his businesses, the transfers of his business assets during his lifetime, and his estate plan were "false and untrue." At his November 2008 deposition, Cohen said "[James] didn't know about my will."

In a December 2010 affidavit, Cohen stated that James never unduly influenced him or exercised control over his testamentary plan. Cohen said he had asked his attorney, on his own initiative, to remove Samantha from any possible ownership of his Palm Beach home and "to make sure that, upon my death, James has ownership and control of all of my business interests and our Palm Beach home." Cohen added:

I have not lost my mind or my free will. If Ronald Perelman or Samantha claim, after I have died, that any aspect of my estate plan was the product of undue influence or fraud by my son James, I want the court and the world to know that the claim is false, and I knowingly and unequivocally re-affirm and ratify all transfers and transactions that have come, or may come, under legal challenge. All changes to my testamentary documents, both before and after the death of my beloved daughter Claudia, reflect my own testamentary intent, and I ask that my intent be given full force and effect after my death.

As the trial judge found, there is no evidence supporting Samantha's claim that James was "intimately involved in procuring" the changes to Cohen's 2007 and 2008 wills.[3] No evidence supports the allegation that Cohen was unduly influenced at the time of the July 2009 will's execution. Cohen expressly stated on the first page of his July 2009 Last Will and Testament that he was "revoking all prior Wills and Codicils made by me." After finding that the July 2009 will was not the product of undue influence and that it was Cohen's true and valid

---

[3] Samantha relies on an unpublished opinion, In re Estate of Olsen, No. A-5542-11 (App. Div. Apr. 30, 2014), to argue that the court erred by failing to consider evidence of undue influence in the years preceding the execution of the July 2009 will. That case, however, is factually distinguishable. In Olsen, the court found that the plaintiff failed to rebut the presumption of undue influence over the last will and, therefore, reviewed the earlier wills to determine which one to admit for probate. Olsen, slip op. at 20-21. In any event, Olsen is not precedential. R. 1:36-3.

last will, the court had no reason to determine whether his revoked wills were tainted by undue influence.

Samantha also argues on appeal that the court failed to address a new provision in the July 2009 will and four carry-over provisions from earlier wills, and that James failed to rebut the presumption of undue influence created by these provisions. The new provision was designed "to reverse the effect of any court judgment requiring . . . James to pay damages to [Cohen's] estate for undue influence[;]" thus, Samantha claims, this provision "could only harm Robert's estate and was the clearest possible evidence of undue influence." The new provision, Section 3:5E(1), which appeared in Cohen's Fourteenth Amendment and Restatement of Trust Agreement, dated July 17, 2009, provided in relevant part:

> My Trustee shall distribute to JAMES:
> . . . (b) the proceeds of sale from all business entities included in the definition of Robert Cohen Enterprises herein, which at any time were a part of my estate and which proceeds were brought back into my estate as a result of any litigation brought against me or my estate by either RONALD O. PERELMAN, the ESTATE OF CLAUDIA L. COHEN or my granddaughter, SAMANTHA PERELMAN, if he is then surviving, or if not, to his then surviving descendants, per stirpes
> . . . .

A-3275-14T4

Cohen's estate attorney, Ronald Kochman, testified that he suggested the provision at the April 2009 meeting with Cohen and another attorney, Robert Gold. He explained that if proceeds from a sale of business interests were returned to Cohen's estate because of a court judgment, this provision would bequeath the funds to James.

Kochman denied inserting this provision in the event the court found undue influence by James. To the contrary, he understood that the court had rejected the claims of undue influence as premature in the promise case. Instead, Kochman maintained throughout his testimony that Cohen's goal was to leave the business to James and there was never any deviation from that intent.

Contrary to Samantha's assertion, the new provision was not evidence of undue influence or harmful to Cohen's estate. It was consistent with his longtime desire for James to inherit the business assets, and advanced that purpose.

Samantha also argues that the Booth buyout initiated by James, with Kochman's assistance, thwarted Cohen's intention to let Samantha keep her mother's interest in the Palm Beach residence. She relies on Kochman's testimony that it was impossible for her to own a 50% interest, unless James withdrew his demand for the buyout. Because James did not withdraw it,

28

A-3275-14T4

Samantha argues, the evidence confirmed James's undue influence over his father.

We previously addressed the issue of the buyout in <u>Booth Computers</u>, concluding, among other things, that the buyout agreement was enforceable, and the disparity between book and market values did not render the agreement unconscionable. 421 N.J. Super. at 139. The agreement was consistent with Cohen's intent for the beneficiaries to be family members. <u>Id.</u> at 160. We explained: "The possibility or even probability that a surviving child would be the ultimate beneficiary of the assets of the partnership was apparent on the face of the agreement." <u>Ibid.</u>

Furthermore, as Cohen explained in his 2010 affidavit, he intended to ask his attorney to remove Samantha from any possible ownership in his Palm Beach home. And as the trial court found, Cohen made the changes to his July 2009 will "at his own discretion and by his own free will in response to prior bitter litigation with his granddaughter and ex son-in-law." Accordingly, the trial judge correctly found that neither James nor Kochman thwarted Cohen's intent to honor Samantha's request to inherit her mother's ownership interest in the Palm Beach residence.

29

Samantha also challenges Cohen's decision in his November 2007 will to divide his residuary estate among his six grandchildren. She argues that "[g]iving James's children two-thirds" of his residuary estate would "only increase the advantage of James's children" over her and that "[n]o witness gave any plausible explanation why [Cohen] would want to do that."

This argument ignores the record. Kochman testified that he advised Cohen that James's children would incur an additional "generation-skipping tax" because they had a living parent in their line of descent, but Cohen did not care. James similarly testified that he asked his father to eliminate his children as residual beneficiaries to avoid the tax. However, Cohen wanted all of his grandchildren to be treated substantially the same and did not want Samantha to get "a great deal more than any of the other grandchildren."

## III.

Samantha also challenges the court's finding that Cohen intended to pass the Cohen family business to James, claiming it does not explain why Cohen changed his wills over time to leave his son the non-business assets as well. Prior to the February 2007 will, Samantha—if her mother predeceased Cohen— was to inherit cash bequests, Cohen's interest in the Palm Beach residence, two business entities, and the entire residuary estate. James was to receive

ownership of the Hudson business, including its wholesale and retail operations. Samantha argues that after James became involved in his father's estate planning, Cohen changed his wills over time to leave James the assets initially intended for her mother.

The trial court found that "Robert Cohen's intentions were clear that he wanted to pass the Cohen family business, Hudson Media Inc., on to his son, James Cohen, and the 2009 Final Will (and Trust) fulfills that objective." Samantha does not dispute that her grandfather intended for James to inherit the family business. Instead, she argues that the presumption of undue influence arose from changes in the 2007 and 2008 wills that transferred bequests of certain non-business assets to James. Contrary to Samantha's assertion, the record provides ample evidence that these changes do not impact the trial court's finding of no undue influence.

The evidence establishes that Cohen changed his testamentary instruments following Claudia's death. Cohen had taken steps to provide financially for Claudia in anticipation of the end of her alimony payments, but Cohen told Kochman that Samantha's father was a billionaire and she did not need his money. Even Samantha acknowledged at trial that Cohen intended to leave the non-business assets to her mother and that she did not consider it unreasonable

A-3275-14T4

for Cohen, after her mother's death, to factor into his testamentary plans "her status as the daughter of one of the wealthiest people in the world." Kochman testified at trial that it was not surprising that Cohen wanted to change his will within weeks of Claudia's death, explaining: "When a child dies, those kinds of things happen."

After Claudia's death, Cohen wanted to change his will to give essentially equal bequests to his six grandchildren. When Jay Marshall advised Cohen at a meeting "very close" to Claudia's death in 2007 that any bequests to her would go to Samantha, Cohen expressed surprise that Samantha would receive a "great deal more" than his other grandchildren. He told Marshall that he wanted to treat all his grandchildren substantially the same.

Consequently, Cohen's November 2007 will named his six grandchildren as equal beneficiaries of the residue, not just Samantha. When Kochman explained that James's children would incur an additional generation-skipping tax, Cohen did not care.

Cohen also told Kochman that he wanted to leave more to his children than to his grandchildren. His speech therapist, Katherine Malmrose, recalled a similar response from Cohen in response to her question about estate planning, when he replied: "A child is a child. A grandchild is a grandchild." Thus, after

32

Claudia's passing, Cohen's additional bequests to James were consistent with his intention to favor his son over his grandchildren.

The evidence also established that Kochman and Gold recommended Samantha's removal from the residuary estate and the change to a lifetime license to use the Palm Beach residence, instead of an ownership interest. They suggested these changes at the April 2009 meeting, outside of James's presence. As the court found, the attorneys recommended these modifications to protect their client by limiting Samantha's opportunity to sue Cohen or his family after he died. The judge found Gold particularly credible in his testimony concerning his attempts to protect his client.

Contrary to Samantha's assertion, the judge did not err. There was substantial credible evidence in the record to support her finding that Cohen's changes in his testamentary bequests were consistent with his estate plan. Rova Farms Resort, 65 N.J. at 484; Liebl, 260 N.J. Super. at 524.

Samantha also challenges the court's finding that the changes in the bequest of the Palm Beach residence were consistent with recommendations made by Cohen's attorneys at the meeting on April 2, 2009, and, therefore, they were not the products of undue influence. She bases this point on an allegation the attorneys had conflicts of interest at the time of the meeting.

The court, to the contrary, made the following finding of fact:

> Changes to the 2009 Final Will to remove Samantha Perelman from the residuary and reduce her bequest in the Palm Beach residence to a lifetime twenty-one day-per-year use license, were consistent with specific recommendations made to Robert Cohen by his attorneys during an April 2, 2009 meeting and there is no evidence that James Cohen was privy to or that he suggested these changes.

The court also found that Kochman and Gold made these recommendations at the April 2 meeting given the litigation underway and the likelihood of more litigation in the future. The "very real threat" of continuing litigation made it reasonable for Cohen's attorneys to take steps to protect their client by limiting Samantha's standing to sue Cohen when he was alive, or to sue his family members after he died. "The lawsuits filed since certainly prove that this recommendation was wisely prescient."

The court also found no evidence that James attended the April 2 meeting, that he suggested the changes, or that he discussed the changes with the two attorneys or with his father. There was no conflict of interest and, regardless of any conflict, it made "perfect sense" for Cohen to make the recommended changes to his will "given the litigious circumstances at that time." The evidence supports that conclusion.

Samantha also argues that, prior to the meeting on April 2, 2009, Kochman engaged in regular communications with James's attorney Frank Huttle, that he sent him a copy of the draft July 2009 will for review, and that Gold had divided loyalties as well.

Kochman acknowledged that he spoke on the telephone with Huttle almost every day in 2008 and 2009 in connection with litigation matters. He denied working with Huttle, however, on drafting the July 2009 will. Huttle had input into only one dispositive provision with respect to subtracting litigation fees from any proceeds Samantha would receive from the Palm Beach residence. According to Kochman, Huttle "added four or five words."

The evidence shows that Kochman and Gold were long-time friends. Kochman advised Cohen to retain litigation counsel and recommended Gold for the position. Before then, Gold, an experienced New York attorney, represented Kochman in a Security and Exchange Commission (SEC) case, and Kochman represented Gold's family with respect to certain trusts.

Gold's interview with Cohen took place in March 2008 and lasted for about thirty minutes. Huttle was present initially, but then left Gold and Cohen alone, with a nurse. Cohen subsequently hired Gold as chief trial counsel, and James signed the engagement letter using a power of attorney.

Shortly after being retained, Gold signed a joint defense agreement with James based on his conclusion that there was no existing conflict between father and son. In fact, during the entire time he represented Cohen, Gold said he never perceived a conflict of interest between them. Gold said he understood from his first meeting with Cohen and from follow-up conversations with Kochman that he would not be representing James. Indeed, at trial, Samantha's attorney acknowledged that he never contended Gold represented James, explaining: "We understand that Mr. Gold represented Robert Cohen." There is no evidence to suggest otherwise.

Moreover, Gold testified that he did not engage in communications with Kochman "outside the context of litigation." He asked Kochman to attend a meeting with Cohen on April 2, 2009, to make changes in Cohen's will, but James was not present. Gold said Cohen's mood that day was remarkably sad. Because Gold relied on the litigation privilege throughout discovery, the court ruled that the details of the meeting were not permissible at trial.

Based on the record, and the court's findings on the credibility of Kochman and Gold, the record supported the finding that they had no conflicts of interest when they met with Cohen on April 2, 2009. Moreover, there is no evidence that James suggested the changes or discussed them with the attorneys

36

before the meeting. Contrary to Samantha's assertion, there is simply no evidence that Gold supported the changes because they were in the best interest of Kochman.

IV.

Samantha next argues that the court erred by finding Cohen made the changes to his July 2009 will in response to prior "bitter litigation" with Samantha and her father. The court found that Cohen made the changes to the July 2009 will "at his own discretion and by his own free will in response to prior bitter litigation with his granddaughter and ex son-in-law." It also described the prior litigation history as a "major catalyst" for the unusual length of this trial.

There was substantial credible evidence supporting the court's finding that Cohen's response to the prior litigation was a factor in his decision to make changes to his July 2009 will. See Liebl, 260 N.J. Super. at 524. In February 2008, after Cohen received a request from Perelman's attorney to hold a portion of the Advent proceeds for Claudia's estate, Kochman advised Cohen to retain trial counsel. As we have said, the Perelmans subsequently filed lawsuits against Cohen and James in New Jersey, New York and Florida state courts, and in federal court, plus pursued four appeals in New Jersey.

James testified that his father understood the claims, that he and his father met daily to discuss the ongoing litigation, and that his father read the court decisions or he read them to his father. James recalled that his father was very sad after reading Samantha's 2008 affidavit in which she described her grandfather as "not of sound mind, or something to that effect." His father was angry after Samantha and her father filed a RICO complaint against him.

As a result of the litigation, Cohen underwent medical examinations, gave deposition testimony, and testified at trial. Judge Koblitz described the medical examinations as extensive, "tremendously burdensome[,]" and even Samantha acknowledged that her grandfather would not have liked the medical examinations. Cohen gave his videotaped deposition in 2008 while velcro-strapped into his wheelchair.

Cohen also testified twice at trial in April and May 2009. Gold said the first day ended after two hours because Cohen was exhausted, choking, and having difficulty breathing. Afterwards, Gold described Cohen as angry and James as distraught. James similarly described his father as exhausted after his trial testimony. It is no surprise that, two months after his May 2009 trial testimony, Cohen made changes to his July 2009 will that favored James over

Samantha. Clearly, Cohen changed his July 2009 will based, in part, on his response to prior litigation.

V.

Samantha argues that the court erred by conflating the prior findings of Cohen's mental capacity with evidence of a lack of undue influence. She objects to the finding that "[a]lthough Robert Cohen suffered from severe physical disabilities due to a form of Parkinson's disease, his cognitive abilities were largely intact, and he could still speak and communicate, albeit with difficulties, up until and beyond the date when the 2009 Final Will was executed on July 17, 2009." She selectively quotes the trial judge's finding that "Robert Cohen was legally competent and had the required testamentary capacity to make changes to his 2009 Final Will[,]" but she omits the rest of the sentence—"as ruled by Judge Koblitz just weeks before the 2009 Final Will was executed, and [h]is competency was further supported by the evidence presented at this trial concerning the time period leading up to the Final Will's execution."

The trial judge's assessment of Cohen's cognitive abilities accurately summarized the testimony of numerous witnesses who testified during the trial. The court was "particularly persuaded" by Gold and Christopher Weiss, who testified that Cohen participated in trial preparation work in 2008 and 2009, and

understood what they told him. Overall, the evidence supports her conclusion that despite his devastating disease, Cohen retained his cognitive abilities. The finding on his legal competence referred to Judge Koblitz's ruling shortly before the execution of the July 2009 will. Neither finding expressly or implicitly suggests that Cohen's mental capacity prevented James from exercising undue influence over him.

Samantha also disputes the court's finding that "[t]he relationship between James Cohen and Robert Cohen was harmonious and remarkably free from any conflicts, disagreements or arguments." The court also found: "Cohen's personality, despite his Parkinson's disease, remained as it was, strong-willed and determined, resisting even medical advice in doing what he wanted for pleasure despite his ailments." Moreover, "James Cohen had a tremendous amount of deference to his father and there is no evidence whatsoever that James attempted to 'coerce' or 'dominate' his father and, most likely, could not have done so even if he had wanted."

The evidence showed Cohen remained strong-willed and controlling until the end of his life. For example, as the court found, Cohen was propped by nurses to sit upright in his wheelchair, always wore a suit and tie, and had "a tremendous and admirable sense of dignity and pride that dominated a room."

Witnesses universally described James as deferential and respectful to his father. Although father and son lived and worked together for over fifty years, the court found not a single witness who recalled disagreements between them. That finding of fact—that Cohen and his son retained a harmonious relationship—did not undercut the judge's conclusion that James did not exert undue influence over Cohen's management of his affairs. Simply put, the record supports the trial judge's conclusions.

Contrary to Samantha's assertion, James did not dominate his father's personal affairs. For example, according to Samantha, James demanded that Jeffrey Margel, Cohen's chef and house manager, spend the summer working for him and fired Margel when he objected. She also claims that James fired David Merritt, Cohen's aide, even though Cohen had no issue with Merritt, and that James disregarded Cohen's directions "in his wills" to keep Juan Espinal, his chauffer for twenty-five years, as Harriet's driver. She cites further examples where James controlled employee salaries and bills.

A review of the record reveals that Samantha's analysis is incomplete. Margel explained that James wanted him to spend the summer of 2011 in East Hampton, but the housing arrangements would not accommodate his wife so he was terminated from employment. Margel acknowledged at his deposition that

41

James and Claudia paid a portion of his salary. Likewise, Merritt testified that James fired him in December 2007 because he was tired and unable to perform his duties. Espinal confirmed that he became James's driver after Cohen died, but said his job changed based on a conversation that James had with his father. As for the payment of salaries and bills, James testified that he ran the Hudson business for approximately twenty years as president and CEO, while his father made the major decisions. This evidence does not prove undue influence, nor does it weaken the trial court's conclusion.

VI.

We next address Samantha's contentions that the trial court erred by finding she lacked standing to challenge the inter vivos transactions, refusing to examine their fairness, and rejecting the opinions of her tax expert. With respect to inter vivos transfers, the presumption of undue influence arises when the challenger proves that the donee dominated the will of the donor, or when a confidential relationship exists between donee and donor. Pascale, 113 N.J. at 30. In such cases, "the donee has the burden of showing by clear and convincing evidence not only that 'no deception was practiced herein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood.'" Id. at 31 (quoting In re Dodge, 50 N.J 192, 227 (1967)). If a donor is dependent

on the donee and makes a gift that "strips the donor of all or virtually all his assets, a presumption arises that the donor did not understand the consequences of his act." Ibid. However, when the donor is not dependent on the donee, independent advice is not a prerequisite to the validity of an improvident gift even when the parties have a relationship of trust and confidence. Id. at 31, 39 (holding son had rebutted the presumption of undue influence, where the father, "an experienced and shrewd businessman," understood the consequences of what he was doing when he made the transfers).

The court found that any judgment restoring to Cohen's estate all or part of the inter vivos transfers of business assets, or their monetary equivalent, would become part of the residuary estate because the July 2009 will did not include specific bequests that would govern how the restored funds would be bequeathed. Samantha, however, was not a beneficiary to the residuary estate under the July 2009 will. The court, therefore, concluded that she had no standing to assert a claim on the inter vivos transfers. Given the dismissal of Samantha's undue influence claims for the inter vivos transfers, the court found moot her remaining claim that James return an estimated $384.4 million to Cohen's estate.

Standing requires a plaintiff to have the ability or entitlement to maintain an action before the court.  In re Adoption of Baby T., 160 N.J. 332, 340 (1999). A plaintiff must have "a sufficient stake and real adverseness with respect to the subject matter of the litigation" and a substantial likelihood of harm in the event of an unfavorable decision.  Jen Elec., Inc. v. Cty. of Essex, 197 N.J. 627, 645 (2009) (quoting In re Baby T., 160 N.J. at 340).  "[A] lack of standing by a plaintiff precludes a court from entertaining any of the substantive issues for determination."  Ibid. (quoting In re Baby T., 160 N.J. at 340).  See Stockdale, 196 N.J. at 302 (noting that standing to challenge will that has been or is expected to be offered for probate requires status as one injured by probate of will being contested); In re Tierney, 175 N.J. Super. 614, 618 (Law Div. 1980) (holding the plaintiff must have standing for the court to reach the substantive issue of incompetency), aff'd o.b., 177 N.J. Super. 245 (App. Div. 1981).  Since we affirm the trial court's finding admitting the July 2009 will to probate, Samantha lacks standing to challenge the inter vivos transactions because she was not a residuary beneficiary.

Samantha also contends that the court erred by finding it was irrelevant whether the inter vivos transfers and related transactions were unfair.  She argues that the transactions "eviscerated" Cohen's testamentary bequests,

"gutted" his bequests to his wife, Harriet, and "nullified" eleven years of consistent bequests providing that she or her mother would receive certain other assets.

The court acknowledged the position taken by Samantha and her witnesses that James was unfair to his father by executing "transfers of business assets that his father never would have agreed to or approved had he fully understood them, including their potential for hidden tax risks." It found that Stephen Blum, Samantha's tax and estate expert, was the primary source of testimony of unfair dealings between Cohen and James with respect to the inter vivos transfers.

The court, however, found Blum's testimony to be unpersuasive. Blum considered the transfers unfair from a financial perspective because James did not provide sufficient consideration in return for receiving his father's ownership in Hudson News and later, Hudson Media. But the court found the issue was "not to determine whether the results of the transfers or transactions were 'fair' to Robert Cohen, but . . . to determine the donor's intent and whether there was any undue influence in the donor's exercise of his intent."

The court explained: "With all due respect to Mr. Blum, his overall premise that an inter vivos gift structured specifically to save on taxes must be 'fair' to a testator, irrespective of his intent, is simply not based on any binding

or controlling law."  Blum conceded at trial that he did not consider Cohen's intent.

Cohen testified in the prior litigation that he intended to and had transferred the majority of his business assets to his son.  He knew that "Jimmy" made at least $500 million from the transactions, but did not want the money back, and did not consider his son to have pressured him to make the transfers. He also understood that his estate plan provided his son with substantial assets in addition to the inter vivos transactions.

In his 2008 affidavit, Cohen said the allegation of undue influence in connection with the transfers of his business assets during his lifetime was "completely false and untrue."  Likewise, in his 2010 affidavit, Cohen said it was his wish for James to have ownership and control of all of his business interests, and denied that any aspect of his estate plan was the product of undue influence.  He stated:  "I want the court and the world to know that the claim [of undue influence] is false, and I knowingly and unequivocally re-affirm and ratify all transfers and transactions that have come, or may come, under legal challenge."

Gold, who drafted the 2008 affidavit, testified that he reviewed it with Cohen, who requested modifications.  At his deposition, Cohen recalled

preparing the affidavit with his attorney and said it was his idea. Likewise, Kochman testified that he read the 2010 affidavit to Cohen prior to the signing, asked if Cohen agreed with its contents, and Cohen blinked yes.

In his own words, Cohen intended to make the inter vivos transfers to James. There is no evidence in the record to suggest that the transfers of business assets during his lifetime were the result of any deception or undue influence, or that they were not fair, open, voluntary and well understood by him. Instead, Cohen, an experienced and successful businessman, completed the inter vivos transfers consistent with his intention in his testamentary instruments to pass the business, and far more, to his son.

Samantha argues the court erred by rejecting the testimony of her tax expert, Anita Siegel, who opined that the inter vivos transactions created the risk of substantial gift tax liabilities. Like with Blum, the trial court rejected the underlying premise of Siegel's testimony. A "large percentage of the trial" consisted of "lengthy, detailed and arcane testimony regarding the nature and structure of these complex contested inter vivos transfers," which the expert believed were all flawed.

"Not too surprisingly," James's tax expert, Glen Henkel, believed neither the contested transfers nor the $600 million cash allocation to James created

unpaid gift tax liabilities. The evidence showed that the IRS had conducted and completed an audit on some of the transactions, "with all discrepancies identified by the I.R.S. resolved."

The court engaged in a comprehensive review of Siegel's and Henkel's testimony, and simply found unpersuasive Siegel's opinion that there were flaws in the structure of the inter vivos transactions and the calculations used to allocate $600 million in cash to James from the Advent acquisition.

The trial court reviewed the conflicting expert testimony and resolved the conflict in favor of James. It cannot be disputed that a judge has the discretion to accept or reject all or a portion of an expert's testimony. Torres v. Schripps, Inc., 342 N.J. Super. 419, 430-31 (App. Div. 2001). Separately from Samantha's lack of standing, we see no abuse of discretion in the judge's decision to reject her experts' testimony.

## VII.

Over the course of the litigation, Samantha was represented by four law firms: Friedman, Kaplan, Seiler & Adelman, LLP (Friedman Kaplan); Greenbaum, Rowe, Smith & Davis, LLP (Greenbaum Rowe); Aronsohn, Weiner, Salerno & Bremer, PC (Aronsohn Weiner); and Sills Cummis & Gross, PC (Sills Cummis). Affidavits of services were submitted by each of these

firms, with Edward A. Friedman submitting an affidavit with ninety attached exhibits for Friedman Kaplan; Paul A. Rowe submitting an affidavit with seventeen attached exhibits for Greenbaum Rowe; Richard Epstein submitting an affidavit with thirty-five attached exhibits for Sills Cummis; and Richard H. Weiner submitting an affidavit with two attached exhibits for Aronsohn Weiner.

The discovery master reviewed these submissions along with James's responding papers, which included certifications from James's attorneys and line-by-line coded objections to the time entries in the billing statements provided by Friedman, Rowe, Epstein, and Weiner. The discovery master also reviewed Samantha's reply submissions and attachments.

The discovery master discussed the history of the present litigation, explaining that he was appointed to serve as a special discovery master to assist the court in resolving "a vast sea of disputes relating to a range of issues . . . ." He listed some of the many discovery disputes that had arisen, and observed that the case involved almost sixty depositions and eighty-five trial days. He then discussed his lodestar calculations for each of the law firms' fees as well as his calculation of reasonable costs.

Friedman Kaplan, admitted pro hac vice, took the lead role in conducting discovery and preparing for trial, and claimed fees for legal services from April

2012 to March 2014. Thirty-eight timekeepers submitted billing, including seven partners, nine associates, one staff attorney, two paralegal supervisors, one librarian, one managing clerk, twelve paralegals, one temporary paralegal, and four litigation support managers. The billings ranged from $725 per hour for Friedman to $32 per hour for a temporary paralegal. The discovery master reduced the hourly rates charged by Friedman Kaplan by 20 to 25% as a result of his research into the prevailing hourly rates for comparable work by comparably experienced counsel. Although many of the invoices contained difficult to understand redactions, they were not entirely incomprehensible. More than one attorney attended each proceeding, although the discovery master concluded that it was unwarranted to compensate Samantha for those multiple billings. After his review of the submissions, he reduced the number of hours, with reductions varying from 12.5% for Friedman to 50% for an associate who billed the lowest number of hours. After these adjustments, the firm's initial fee request of $12,274,740.18 was reduced to a lodestar of $7,383,842.

Greenbaum Rowe's final submission for fees covered the period from June 2013 through March 2014. The master adjusted the relevant billing period to September 2013 through March 2014 to avoid accusations of duplication of efforts as Greenbaum Rowe replaced Sills Cummis in September 2013. The

A-3275-14T4

master applied a 20% across-the-board hourly-rate reduction for the attorneys who attended trial regularly on behalf of the firm. He observed that the firm's billable hours should be reduced by 25% as despite their full participation in the proceedings, intra-office conference time and work performed by Friedman Kaplan should not be counted. Accordingly, he reduced the firm's requested $3,994,717 to a lodestar of $2,345,084. He explained in a footnote, although he should perhaps have allowed more of the Greenbaum Rowe fee and less of Friedman Kaplan, these disparities were not significant because in the final analysis the award was to Samantha and not to individual firms.

Aronsohn Weiner also eliminated its billing between June 2013 and August 2013, and the discovery master excluded from consideration the bill for April 2014. The firm, which expended considerable time in settlement efforts, requested $448,868.75 in fees. Applying the same principles, he concluded the lodestar was $269,321.

Sills Cummis submitted only an affidavit of services covering March 2012 through September 2013. A number of those efforts significantly overlapped and duplicated those of Friedman Kaplan. The firm's request was thus reduced by 41%, from $3,264,891 to a lodestar of $1,926,286.

Thus, the lodestar fee for the four firms totaled $11,924,533. The master noted that while Samantha was able to shift the burden of proof to James, she ultimately did not prevail. Thus he adjusted those figures downward by 20%, resulting in an award of $9,539,626.

Samantha's costs included expert witnesses, electronic discovery vendor costs, trial technology operator costs, court reporter and videographer fees, outside document review costs, photocopying expenses, computerized research costs, transcript costs, and other sundry expenses. The discovery master, after careful review, reduced expert fees by slightly more than 50%. He then, item by item, reduced other expenses in amounts ranging from 50% to 25%. He did not reimburse Samantha for her share of his own fees.

The master arrived at a base amount of $1,038,475 for costs. This assumed that the court would award fees for the work performed in presenting the inter vivos transfers to the court.

In rendering its decision after reviewing the report, the trial court stated:

> Understanding this litigation thoroughly and having issued the June 24, 2014 Decision, I am satisfied that the Discovery Master has a meticulous and comprehensive understanding of the billing involved, both before and during trial and, as such, I accept his Report and his recommendations. The Court sat through the entire bench trial, absorbing the evidence on a daily basis, and I am thoroughly acquainted with

52

the subject discovery that preceded the trial. Acceptance of the Discovery Master's thorough, organized and thoughtful recommendations is reached after my own review of the parties' submissions, including their replies to the Discovery Master's Report, as well as my personal day-to-day six month involvement with the case.

## VIII.

James's primary argument in support of his appeal of the fee award is that any reimbursement is really to Perelman and not Samantha herself.[4] He further contends that Samantha's attorneys' failure to produce their retainer agreement is proof that their engagement was unethical, and warrants a remand.

Samantha responds that nothing in <u>Rule</u> 4:42-9(a)(3) restricts an attorney fee award to those who actually paid the sum out-of-pocket and that when a claim is being made against an estate, it is not uncommon for legal action to be funded by family. She further asserts that since there is no conflict between herself and her father, there is no ethical violation. She was a teenager when the litigation began, and obviously lacked the resources to fund the lawsuit. Finally, she also observes that "[w]here a prevailing party is entitled to counsel fees by

---

[4] In making that argument, he relies on an unpublished opinion, which has no precedential value. <u>R.</u> 1:36-3; <u>see also</u> <u>Trinity Cemetery Ass'n v. Twp. of Wall</u>, 170 N.J. 39, 48 (2001) (Verniero, J., concurring) (stating that an unreported decision "serve[s] no precedential value and cannot reliably be considered part of our common law").

rule, courts have awarded fees against the losing side regardless of the manner in which the litigation was financed." See Specialized Med. Sys., Inc. v. Lemmerling, 252 N.J. Super. 180 (App. Div. 1991).

A trial court's fee determinations are accorded substantial deference, and are disturbed only on the rarest of occasions—because of a clear abuse of discretion. Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001); Rendine v. Pantzer, 141 N.J. 292, 317 (1995); Yueh v. Yueh, 329 N.J. Super. 447, 466 (App. Div. 2000); In re Bloomer's Estate, 43 N.J. Super. 414, 416 (App. Div. 1957). An abuse of discretion in the award of counsel fees may be demonstrated "if the discretionary act was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment." Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005).

Whether an allowance is permissible under the court rules, however, is a question of law that is subject to de novo review. See Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 372 (1999) ("Matters of law are subject to de novo review."); Manalapan Realty, 140 N.J. at 378 ("A trial court's interpretation of

the law and the legal consequences that flow from established facts are not entitled to any special deference.").[5]

Rule 4:42-9(a)(3) provides that in a probate action, "[i]f probate is granted, and it shall appear that the contestant had reasonable cause for contesting the validity of the will or codicil, the court may make an allowance to the proponent and the contestant, to be paid out of the estate." In accordance with this rule, courts may allow counsel fees to the contestant in a will dispute "'[e]xcept in a weak or meretricious case.'" In re Probate of Will & Codicil of Macool, 416 N.J. Super. 298, 313 (App. Div. 2010) (alteration in original) (quoting In re Reisdorf, 80 N.J. 319, 326 (1979)).

Other than an unpublished opinion, James does not offer any precedent for his position that legal fees should not be reimbursed where they did not come from the party involved in the litigation. In this particular case, involving an intra-family dispute and a challenger who was a minor at the time litigation began, reimbursement is appropriate.

---

[5] James's reliance on In re Malone, 381 N.J. Super. 344, 349 (App. Div. 2005) for the proposition that the award of counsel fees is a mixed question of law and fact for which review is de novo is misplaced. Malone was an appeal from an award of attorneys' fees by the Merit System Board, and the court, upon noting that setting an award of counsel fees is a judicial function, declined to apply the deferential standard of review typically afforded to administrative decisions. Id. at 348-49. It is thus distinguishable from the situation here where a trial court made the fee determination, but in doing so ruled on several issues of law.

The authority in this area is scant. In New Jersey, no case addresses whether counsel fees should be awarded to an unsuccessful will contestant whose expenses are paid by a third party. The circumstances of this case, the relationship between the parties, the lingering and devastating illness suffered by Cohen before his death, the business relationship between Cohen and his son, and the size of the estate at issue, make this case not only one of first impression, but the circumstances are unlikely to be repeated. In our view, however, so long as the award is authorized by statute or rule in the first place, and the funding for the litigation does not run contrary to the public interest, there should not be a bar to reimbursement. This was a father and daughter. There is no suggestion, for example, that the funding of the litigation satisfied some destructive economic purpose, such as unfair competition, or that the funding supported litigation that was intended to harm, or that otherwise ran contrary to the public interest.

Under Rule 4:42-9(a)(3), a party is entitled to receive an allowance for fees and costs regardless of whether they prevailed. The case most similar to the one under consideration here is Carmel v. Borough of Hillsdale, 178 N.J. Super. 185, 189-90 (App. Div. 1981). In that case, we found that Rule 4:42-9(a)(8) permitted a counsel fee award to parties who successfully challenged the

validity of a municipal ordinance under 42 U.S.C.A. § 1988. <u>Carmel</u>, 178 N.J. Super. at 188. The counsel fee award was not rendered unjust because the fees were advanced by a privately funded entity. This enabled litigants who might not otherwise pursue the vindication of their civil rights to obtain legal representation. <u>Id.</u> at 189-90. As the court in <u>Carmel</u> noted, the greater concern is whether the party seeking fees is entitled to an award by contract, statute, or rule. <u>Rule</u> 4:42-9(a)(3) entitles a party to receive an allowance for fees and costs regardless of whether they prevail.

We agree with James's contention that attorney's fees in will contests are available only where the contestant has reasonable cause to challenge. In this case, however, there was a reasonable basis for the litigation. That Cohen was found to be competent at the time of the execution of the will documents did not address the question of undue influence, admittedly a separate issue.

Regardless of the alleged bad blood between Perelman and anyone else, there was a legitimate basis for the dispute. Awarding fees to contestants whose good faith litigation is funded by third parties does not encourage interlopers to disturb the orderly administration of estates. It simply enables those who have colorable claims to litigate in good faith.

James's charge of unethical behavior on the part of Samantha's attorneys lacks merit because no conflict of interest is revealed in the record between Samantha and her father. Nor can James identify a reason production of the retainer agreements might have shaped the judge's final decision regarding the amounts. The trial judge clearly understood who was paying the bills, and made an award in accord with the rules.

## IX.

James also contends that the court's comment when initially discussing the fee application he should "forget about zero," meant he was not heard. We do not agree that it foreclosed counsel from defending against a fee award, or improperly limited him to "quantum" arguments. Even if we were to assume hypothetically that the judge's mind was made up that some award was appropriate, that is not the equivalent of barring argument. We consider this point to be so lacking in merit as to not warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

## X.

James also contends that the amount initially sought by counsel, a total with costs of $23.5 million, is so excessive as to warrant a sanction against

Samantha. In support of this position, he cites to federal caselaw holding that when fee applications are grossly excessive, they are denied in their entirety.

James essentially accuses the court of avoiding stating the full amount of the fee request in print because the amount was so outrageous, and accuses Samantha of seeking reimbursement for unproductive work, overstaffing, and noncompensible claims. He characterizes the fee application as "appalling," and lists seven time sheet entries that he asserts illustrate "jaw-dropping excess, vagueness or opacity." He asserts that Cohen's heirs should not see their inheritance nullified by "a lawsuit that, from start to end, was an exercise in spite." These comments are inapposite in light of the six-month trial, and the court's decision to shift the burden to James to prove by clear and convincing evidence that no undue influence was exerted upon Cohen in the formulation of his final estate plan.

In Clemens v. New York Central Mutual Life Insurance Co., 903 F.3d 396, 402-03 (3rd Cir. 2018), Fair Housing Council of Greater Washington v. Landow, 999 F.2d 92, 98-99 (4th Cir. 1993), Lewis v. Kendrick, 944 F.2d 949, 958 (1st Cir. 1991), and Brown v. Stackler, 612 F.2d 1057, 1059 (7th Cir. 1980), the courts exercised their discretion under federal fee-shifting statutes by disallowing attorneys' fee awards in order to sanction parties who submitted fee

applications that were "utterly unreasonable," "extreme," or "outrageously excessive." The court in <u>Stackler</u> explained:

> If . . . the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place. To discourage such greed a severer reaction is needful, and the District Court responded appropriately in the case at bar.
>
> [<u>Stackler</u>, 612 F.2d at 1059.]

The problem for James is that neither the court nor the discovery master found that Samantha's fee application was outrageous or utterly unreasonable. The discovery master discussed the complexity of the litigation, and the sheer volume of depositions, motions and oral arguments that were generated. In that context, he did not believe that the fee application was unusual or shocking. The court likewise did not question the reasonableness or accuracy of the fee application.

A discretionary award of counsel fees will only be reversed if it was not premised on consideration of all relevant factors, involved consideration of inappropriate factors, or constituted a clear error in judgment. <u>Masone</u>, 382 N.J.

Super. at 193.[6]  Here, the court considered all relevant factors, including the length and complexity of the litigation.  It did not consider any factor that was not relevant to a lodestar analysis.  Its decision to reject James's request for the unusual and extreme sanction of denying the entire fee application was not clearly erroneous.  For that reason, we reject James's argument on this point.

XI.

James also contends that the court had no authority under Rule 4:42-9(a)(3) to award fees for work that related to the inter vivos transactions.  Those charges should have been segregated, as they did not relate to the probate claim.  This argument also lacks merit.  In order to establish undue influence, Samantha produced years of transactions which benefitted James, at times, she believed, even to the detriment of Cohen's tax position.  Tracking inter vivos transfers was inextricably intertwined with the position that earlier will or related documents should have been admitted to probate.  As the court said:

> the claims for undue influence would not have existed in substantial form but for the inclusion in this litigation of these inter vivos transactions that occurred before Robert's death.  Moreover, the fundamental basis supporting Samantha's undue influence claim, to a large extent, were these non-testamentary transactions.  The

---

[6]  We question the wisdom of Samantha's use of multiple attorneys for court proceedings, depositions, and the like because of the significant impact on the ultimate amount of fees.  Given the sums at stake, however, this is not the case in which to issue guidelines in that regard.

movement of millions of dollars during the last years of Robert's life, that arguably—had the transactions not occurred—would have ended up in Robert's estate, was the bedrock of Samantha's charges for undue influence. These are fees and costs that were related to the ultimate question of undue influence. Finally, trying to peel off the welded layers of legal billing that specifically concern discovery and trial on the inter vivos transactions from the billing concerning the testamentary-related events would be both virtually impossible and unnecessary. The fees and costs I award shall thus include litigation expenses and costs involving those non-testamentary instruments and issues that were presented in support of the undue influence claims, which were intricately intertwined throughout this bench trial.

XII.

In Hensley v. Eckerhart, 461 U.S. 424, 437 (1983), the Court held that the applicant for attorneys' fees "should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." It noted, however, that "there is no certain method of determining when claims are 'related' or 'unrelated'" and counsel "is not required to record in great detail how each minute of his time was expended. . . . But at least counsel should identify the general subject matter of his time expenditures." Id. at 424 n.12.

Nothing in the record suggests that Samantha's counsel failed to identify the general subject matter of the time expenditures. The trial court at least was satisfied that the billing records were sufficiently detailed to allow it to identify

the subject matter of the time entries.  Whether fees that would normally be noncompensable must be paid because they are inseparable from compensable claims is a decision calling upon the trial court's exercise of discretion.

## XIII.

James also argues that the award in this case violated the principles of In re Bloomer, 37 N.J. Super. 85, 94 (App. Div. 1955).  He further contends that the work performed by Samantha's attorneys was unnecessary, duplicative, and excessive, and that she is undeserving of an award in light of the weakness of her position.  Thus he reasons that the twenty percent discount for lack of success is "paltry" and "glaring," and complains that no attempt was made by Samantha's attorneys to limit their fee request to compensable work.

The discovery master's detailed methodology, and the court's thoughtful and thorough consideration of his report and discussion of the parties' positions need not be repeated.  We agree that it is apparent from the massive record in this case, reflecting a months-long trial, that "absolutely no expense was spared in preparation and it appears that no stone was unturned before or during trial." The court said:

> There was virtually not one single day of trial where each side had less than four attorneys in attendance, assisted by computer technicians, as well as a myriad of support staff.

63

It is therefore no surprise that Samantha's initial requested fee allowance exceeded $22,000,000. After self-reflection on the enormity of the request, in this context—replying to James' opposition to the request—as well as temperance due to the Discovery Master's recommendations, Samantha's request whittled down to a total of $11.8 million.

. . . .

I conclude that it would be of no service to the parties, nor would it serve judicial economy (a concept foreign to the parties in this litigation) to direct discovery regarding the hours actually expended by Samantha's counsel. . . . Enough is enough. Again, the goal is not exactitude, and the determination need not be unnecessarily complex or protracted, but I should satisfy myself that the assigned hourly rates and assessment is fair and realistic, after the appropriate adjustments.

It is well-established that when awarding fees under a fee-shifting provision, first the courts must determine the lodestar, "the number of hours reasonably expended multiplied by a reasonable hourly rate." Rendine, 141 N.J. at 334-35. A judge in making the determination as to reasonable fees should not passively accept the submissions of counsel, but must exclude hours that are not reasonably expended if "excessive, redundant, or otherwise unnecessary." Id. at 335 (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)). A further reduction is called upon if the level of success is limited compared to the

relief that is sought.  This is true even if the claims were "'interrelated, nonfrivolous, and raised in good faith.'"  Id. at 336 (quoting Hensley, 461 U.S. at 436).

"[T]he attorney's presentation of billable hours should be set forth in sufficient detail to permit the trial court to ascertain the manner in which the billable hours were divided among the various counsel."  Id. at 337.  However, "'[i]t is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney.'"  Ibid. (quoting Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir. 1973)).

In the specific context of a probate action, the court in Bloomer, 37 N.J. Super. at 94, set forth a non-exclusive list of factors to consider in fixing an allowance for legal services:

> (1) the amount of the estate and the amount thereof in dispute or jeopardy as to which professional services were made necessary;  (2) the nature and extent of the jeopardy or risk involved or incurred; (3) the nature, extent and difficulty of the services rendered; (4) the experience and legal knowledge required, and the skill, diligence, ability and judgment shown; (5) the time necessarily spent by the attorney in the performance of his services; (6) the results obtained; (7) the benefits or advantages resulting to the estate, and their importance; (8) any special circumstances, including the standing of the attorney for integrity and skill;   and, (9) the

> overhead expense to which the attorney has been put.
> In any case, the counsel fee allowed should never
> exceed reasonable compensation for the services
> rendered the estate.

In <u>Township of West Orange v. 769 Associates, LLC</u>, 198 N.J. 529, 542 (2009), the Court cited <u>Bloomer</u> as setting forth factors bearing on the reasonableness of attorneys' fees in estate cases. Viewing the fee award in the <u>Bloomer</u> framework, it appears that many, but not all, factors favor Samantha.

James contends that the estate's worth, if inter vivos claims were excluded, was between $10 million and $25 million. However, had Samantha prevailed and the May 2004 will admitted into probate, her share would have been $65 million in cash bequests, real estate, personal property, and the residuary estate. Had the inter vivos transfers been nullified, an additional $384 million plus interest would have been paid into the residuary estate. Obviously, the stakes were high. The first <u>Bloomer</u> factor was satisfied.

Consideration of the second factor is not helpful under the circumstances presented. Samantha's father funded the litigation, thus she personally had little to lose by engaging in it and everything to gain. Of course, if she and her father are viewed as an economic unit, they had a great deal to lose in terms of litigation expenses.

Turning to the third <u>Bloomer</u> factor, the nature, extent, and difficulty of the services rendered, this was very complex litigation. It involved not only the presentation of the growth, evolution, and management of a financial empire, it required complex medical expert testimony and history that also spanned the years since Cohen was afflicted with his disease.

As to the fourth factor, a great deal of expertise and legal knowledge were required, and skill, diligence, ability, and judgment were shown on both sides. That Samantha was able to hold James to the higher standard of proof given the prior rulings regarding competence is noteworthy. James's characterization of the quality of those services as lacking is not accurate.

The fifth factor also favors Samantha. The discovery master thoroughly examined the amount of time involved. He complied with <u>Rendine</u> and <u>Bloomer</u>, sifted through hundreds, if not thousands, of pages related to the billings and performed the close analysis required by the relevant precedent. He reduced billable hours to account for duplication of effort, excessive staffing, and unproductive forays. His clear and detailed explanation of his lodestar calculations, for which there is ample support in the record, warranted the trial judge's reliance on his report.

A-3275-14T4

While factor six, the results obtained, does not favor Samantha, she did prevail in several contests in the discovery stage, successfully defended against summary judgment motions, and in an important turning point, shifted the burden to James. Indeed, the court found that Samantha had reasonable cause to contest her grandfather's testamentary instruments. In consideration of Samantha's lack of successful results, the court applied an overall discount in addition to the preliminary discounts imposed.

With regard to factor seven, there were no benefits to the estate. The goal of Rule 4:42-9(a)(3), however, is not to benefit the estate, but rather to provide a means of effecting the true intentions of the testator by allowing the award of attorneys' fees and costs to unsuccessful contestants who had reasonable cause for challenging the validity of the will. We note that Bloomer was not a will contest; it involved fees paid to counsel for administering an estate. 37 N.J. Super. at 87-89. While the benefit to an estate is very relevant when assessing fees charged by an estate administrator, it is not as relevant when evaluating fees awarded in a will contest. Indeed, it is difficult to imagine a situation where an unsuccessful challenge to a will would benefit the estate. That observation is in accord with the analysis in In re Estate of Reisen, 313 N.J. Super. 623, 632 (Ch. Div. 1998), where the court found that the fact that the litigation benefitted only

the contestant was irrelevant "precisely because the matter was a will contest." We do not go so far as to say that the benefit (or lack thereof) derived by the estate in an unsuccessful will contest can never be afforded significant weight, we simply hold that the benefit derived by the estate under the circumstances presented here merits only slight consideration.

The final Bloomer factor, the overhead expense, was reduced by the court by more than half except for external costs. Additionally, Samantha was not allowed any reimbursement for her portion of the discovery master's fees.

In sum, Bloomer factors one, three, four and five weigh in Samantha's favor. While factors six and eight do not, the court took those factors into account and imposed appropriate discounts. Although factor seven weighs against Samantha, we do not believe that factor, standing alone, is sufficient to disallow the award of attorneys' fees in this case.

"Counsel fee allowance is a matter which rests in the sound discretion of the trial court. An appellate tribunal will not interfere unless the record discloses manifest misuse of the discretion." In re Landsman, 319 N.J. Super. 252, 271-72 (App. Div. 1999) (citing Bloomer, 43 N.J. Super. at 416). Nothing in the record suggests a manifest misuse of the considerable discretion afforded the court in these matters.

XIV.

James argues that because Friedman Kaplan shared office space with an attorney who years prior had worked on some of Cohen's testamentary documents, a disqualifying conflict of interest existed, and pro hac vice admission should not have been granted. The attorney in question was a law school professor who was the father-in-law of the attorney who was the principal draftsman of Cohen's testamentary documents, and who consulted with him when drafting some of those documents. The professor had occupied the office for some twenty years. He was not listed on the firm's website, stationery, or business cards. He had not collaborated with counsel for that office for some ten years. Although he utilized their systems, he never shared documents or emails regarding those testamentary documents with anyone at the firm.

Admission under Rule 1:21-2 is also discretionary. It will not be reversed absent a showing that the court applied its discretion arbitrarily. NAACP v. State, Dep't of Law & Pub. Safety, 312 N.J. Super. 552, 557-58 (App. Div. 1998); L. Feriozzi Concrete Co. v. Mellon Stuart Co., 229 N.J. Super. 366, 369 (App. Div. 1988). "[O]ur review of a trial court's evaluation of competing evidence as to the existence of attorney conflict of interest is limited to deciding whether the findings could reasonably have been reached on sufficient or

substantial credible evidence in the record, considering the proof as a whole." State v. Murray, 345 N.J. Super. 158, 171 (App. Div. 2001). The court's decision here was not arbitrary and was supported by substantial credible evidence in the record.

The issue was actually addressed by the parties, related to an ongoing discovery dispute, prior to the commencement of the trial. The judge who presided over the matter issued a written opinion in which he found that the relationship between the professor and Friedman Kaplan "does not rise to the level of an actual conflict of interest" because "there is no reasonable basis to conclude that the appearance of impropriety, caused by [the professor's] relationship with Friedman Kaplan is anything more than a 'fanciful possibility.'"

In light of the prior findings, there is no question that the association between the professor and Friedman Kaplan is attenuated. In a different context, we have found that "sharing [ ] office space alone does not give rise to attorney conflict of interest." Murray, 345 N.J. Super. at 171. No appearance of impropriety even exists in this situation. Id. at 172-73.

Friedman permitted the professor to share office space, rent-free, as a gesture of respect for a well-regarded law professor who was also his friend.

71

They had never held themselves out as being members of the same firm, did not refer clients between them, and had not collaborated on a case in at least ten years. They had no financial or other business entanglements. The professor's files would only have been accessible to the firm's IT professionals. The judge's decision to admit the firm pro hac vice and discount the alleged conflict of interest was a reasonable exercise of discretion.

There simply was no basis for a finding that a conflict of interest existed which would have an effect on Samantha's recovery of an award of legal fees. James prevailed. If anyone is aggrieved by the alleged ethical violation, it is Samantha and not he. There is no basis for modification of the judgment awarding counsel fees on these grounds.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3275-14T4